### NORTHERN PAC. R. CO. *v.* SANDERS *et al.*

*(Circuit Court, D. Montana.* September 8, 1891.)

1. PUBLIC LANDS—GRANTS IN AID OF RAILROADS—CONSTRUCTION.
    The act of congress granting land to the Northern Pacific Railroad Company to aid in the construction of its road granted every alternate section of public land, not mineral, designated by odd numbers, for a certain distance on each side of the line it might adopt, to which the United States had title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights "at the time the line of said road should be definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office," and directed that the president should cause the lands to be surveyed on both sides of the line of the road "after the general route should be fixed." Section 6 declared that the odd sections thereby granted should not be liable to "sale, or entry, or pre-emption" before or after such survey, except by the company. *Held,* that the act did not reserve said sections from subsequent entry before the line of the road was definitely fixed by filing a map thereof with the commissioner of the general land-office.

2. SAME—LOCATION—FILING MAP.
    It was not necessary, as a requisite of fixing the "general route" of the road, to file a map thereof in the office of the secretary of the interior, or of the commissioner of the general land-office.

3. CONSTRUCTION OF STATUTES—DECISION OF LAND DEPARTMENT.
    Where there is no ambiguity or doubt in the meaning of a statute, the construction placed upon it by the land department is in no way binding on the courts.

4. FEDERAL CIRCUIT COURTS—PRECEDENTS.
    A decision of one of the circuit courts of the United States is not necessarily binding on the others.

At Law. On rehearing. For former report, see 46 Fed. Rep. 239.

KNOWLES, J. The motion for a rehearing in this case by consent was granted, and upon the point as to whether the alternate odd sections of land, non-mineral, to which the government of the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the general route of plaintiff's road was fixed, to the width of 40 miles on each side of the said general route in Montana, by virtue of section 6 of the act in which is found the grant of land to plaintiff, was reserved from sale, entry, or pre-emption, was reargued. I have determined to adhere to my former ruling, and to hold that said section 6 should not be construed to have this effect, although it must be confessed that the able counsel for plaintiff presented many new and persuasive authorities upon this point. He urges that the point was presented in the brief of counsel to the supreme court for its consideration in *Buttz* v. *Railroad Co.,* 119 U. S. 55, 7 Sup. Ct. Rep. 100. In the statement of the case and of the points presented on the part of the appellant, Buttz, in the official report of this case no such point is presented. The court in that case found without reservation that the agreement between the Indian tribes, who held the right of occupancy to the land in dispute, which agreement extinguished this right of occupancy, was not in force until approved by the secretary of the interior. It says, on page 69 of opinion, (page 106, 7 Sup. Ct. Rep.:) "This modified agreement must be considered as accepted on the part of the United States when it was approved by the secretary of the interior." This was on the 19th of June, 1873. The map of the definite location of plain-

tiff's road was filed with the commissioner of the general land-office on the 26th day of May of the same year. The court having fully shown that the right of pre-emption could not attach to government land until after the Indian title of occupancy had been extinguished, and that, notwithstanding the Indian title of occupancy, the grant to plaintiff attached to the land in dispute as soon as the definite route of plaintiff's road was fixed, and a map thereof filed in the office of the commissioner of the general land-office, there was no ground upon which appellant, Buttz, could rest. The court did not find as a fact that the agreement to cede the Indian title of occupancy took effect at the time the Indians consented to the proposed agreement. The judgment of a court is *res adjudicata* when based upon facts found. Certainly the construction of section 6 of said act, and the effect of fixing the general route of plaintiff's road, was not required for a determination of the case. The supreme court in *Burney* v. *Railroad Co.*, 117 U. S. 228, 6 Sup. Ct. Rep. 654, said of the decision of an important point, when it was previously before it:

"The statement was not at all material to the decision, which was that a deduction should have been made by reason of the intersection of two grants, so far as the prior grant was located within the extension. We recognize the rule that what was decided in a case pending before us on appeal is not open to reconsideration in the same case in a second appeal upon similar facts. The first decision is the law of the case, and must control its disposition; but the rule does not apply to expressions of opinion or matters, the disposition of which was not required for the decision."

Here was an opinion in the same case, and undoubtedly the court of original jurisdiction felt bound by it; but the court, in substance, held that it was error to follow it in that particular wherein the supreme court expressed an opinion upon a point not required for the decision. If the court had found that the agreement for the relinquishment of the Indian title mentioned in the case of *Buttz* v. *Railroad Co.* went into effect when the Indians consented to the modified agreement, then there would have been a necessity for deciding the point at issue. To suppose a fact to exist which a court has held was not a fact with the view of expressing a legal opinion upon it does not seem to me to be required for the decision of a case. In the case of *St. Paul & P. R. Co.* v. *Northern Pac. R. Co.*, 139 U. S. 1, 11 Sup. Ct. Rep. 389, claimed by plaintiff to support the case of *Buttz* v. *Railroad Co., supra*, the supreme court, on page 17 (page 394, 11 Sup. Ct. Rep.) of the opinion said, in speaking of the grant to plaintiff:

"The new rights were to vest with the release of the old rights. The transfer was to be mutual and simultaneous. There was, therefore, no operative grant until there was an effective release; and, whichever date be taken, whether December 13th or 19th, it was subsequent to the definite location of the Northern Pacific Railroad Company in Minnesota. A map of that location, approved by the secretary of the interior, was filed, as stated above, in the office of the commissioner of the general land-office on the 21st of the previous November. No grant was in existence of any lands to any other company which are claimed by the plaintiff in this suit at the time of the definite location of its route."

Again:

"But, independently of this conclusion, we are of opinion that the exception in the act making the grant to the Northern Pacific Railroad Company was not intended to cover other grants for the construction of roads of a similar character, for this would be to embody a provision which would often be repugnant to and defeat the grant itself."

It would seem that the above rulings were sufficient to have disposed of that case, and that there was no occasion for deciding the point at issue in this case upon the construction of said section 6. But, in addition thereto, the court said:

"The Northern Pacific act directed that the president should cause the lands to be surveyed forty miles in width on both sides of the entire line of the road after the general route should be fixed, and provided that the odd sections granted should not be liable to sale, entry, or pre-emption before or after they were surveyed, except by the company. They were therefore excepted by that legislation from grants independently of the withdrawal by the secretary of the interior. His action in formally announcing their withdrawal was only giving publicity to what the law itself declared."

Now, it should be observed that the court was considering in this case two acts of congress, making grants to two different railroad companies, to aid them in constructing their road. The language in said section 6 is:

"And the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after such survey, except by said company."

The term "grant" does not occur among these terms. The terms are, "sale," "entry," and "pre-emption." The supreme court, in speaking of these terms in the case of *Railway Co.* v. *Dunmeyer*, 113 U. S. 629, 5 Sup. Ct. Rep. 566, said:

"In the terminology of the law concerning the disposition of the public lands of the United States each of these words has a distinct and well-known meaning in regard to the mode of acquiring rights to these lands. This is plainly to be seen in the statutes we are construing. In the third section, or granting clause, there are excepted from the grant all lands which at the time the definite location of the road is fixed had been sold, reserved, or otherwise disposed of, and to which a pre-emption or homestead claim had attached. Here sale, pre-emption, and homestead claims are mentioned as three different modes of acquiring an interest in the public lands, which is to be respected when the road became located; and the words are clearly used because they were thought to be necessary. But a sale for money in hand by an entry made by the party buying is throughout the whole body of laws for disposing of the public lands understood to mean a different thing from the establishment of a pre-emption or homestead right, where the party sets up a claim to a definite piece of land, and is bound to build on it, make fences, cultivate, and reside on it for a period of time prescribed by law."

Let us consider these terms, "sale," "entry," and "pre-emption."

"Sale" is a transmutation of property or a right from one man to another in consideration of a sum of money, as opposed to barter, exchange, and gifts. Rap. & L. Law Dict. Benjamin on Sales, in considering the term "sale," says of the element of price, (section 2:)

"It must be money, paid or promised accordingly as the agreement may be for a cash or a credit sale; but, if any other consideration than money be given, it is not a sale."

See, also, Chit. Cont. 373; Story, Cont. § 778; Tied. Sales, § 12. This point has been considered by the supreme court in the case of *Williamson* v. *Berry*, 8 How. 495. In it the court said:

"Upon the first of them, relating to the premises having been parted with by Clark to De Grasse upon a consideration other than cash, we remark that 'sale' is a word of precise legal import, both at law and in equity. It means at all times a contract between two parties to give and to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought and sold."

In the *Five Per Cent. Cases*, 110 U. S. 471, 4 Sup. Ct. Rep. 210, the supreme court made a distinction between public lands disposed of in satisfaction of military land-warrants and those sold for money, and said:

"A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent."

If we turn to the statutes of the United States, we find special provisions for the sale of public lands. See Rev. St. U. S. §§ 2353–2379. There are also provisions for the sale of mineral lands. But nowhere is there any definition of the term "sale" which would make it include a grant of land to a railroad company in aid of the construction of its road, whether we consider the term as used at common law or in the statute.

The supreme court, in the case of *Chotard* v. *Pope*, 12 Wheat. 586, defined the term "entry," as used in the statutes of the United States, and upon this point said:

"The term 'entry,' as applied to appropriations of lands, was probably borrowed from the state of Virginia, in which we find it used in that sense at a very remote period. Many cases will be found in the reports of the decisions of this court in which the titles to western lands were drawn in question which will show how familiarly and generally the term is used by courts and bar. Its sense, in the legal nomenclature of this country, is now as fixed and definite as that of many terms borrowed from the common law. It means that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country by filing his claim in the office of an officer known in the legislation of several states by the epithet of an 'entry-taker,' and corresponds very much in his functions with the register of land-offices under the acts of the United States. In the natural progress of language the term has been introduced into the laws of the United States, and by reference to those laws we think the meaning of the term will be found to be distinctly confined to the appropriation of lands under the laws of the United States at private sale."

With this definition of this term it would be difficult to maintain that a grant to a railroad company in aid of the construction of its road could be embraced in the term "entry."

The term "pre-emption" is well understood, and is sufficiently defined in the provisions of the Revised Statutes of the United States from section 2257 to 2288. It certainly does not cover a grant to a railroad company, such as we are considering.

It is hardly to be presumed that the supreme court intended in the case under consideration to give a new definition to terms which have long been in use in the statutes of the United States, and to reverse de-

cisions of its own which have defined these terms. The term "grant" not being included in the terms "sale," "entry," or "pre-emption," any construction of the same, when the court was considering only the term "grant" as applied to the aid in land given to a railroad company, could not have been essential to the decision of the case at issue, and hence not controlling authority, binding upon other courts. With the highest respect for the supreme court, and with a strong disposition to follow where its beacon of legal light indicates, I cannot but feel that it has not fully considered the point under discussion, and that the construction of the clause in section 6: "And the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before they are surveyed except by said company,"—indicated by it, is not accordance with the rules frequently expressed by it for the construction of legislative grants of the character made to plaintiff.

The point I suggested in the former opinion in considering the case of *Buttz* v. *Railroad Co.*, *supra*, that the supreme court intimated that the law required of the plaintiff the filing of a map of its general route when there was no such provision of the statute in the act making the grant to plaintiff, was discussed at some length upon the rehearing in this case; and it was urged that the filing of this map was one of the acts performed by plaintiff in fixing its route, and that the terms fixing a route implied the filing of such a map with the secretary of the interior. But the case of *Buttz* v. *Railroad Co.*, *supra*, does not so say. It says:

"The general route may be considered as fixed when its general course and direction are determined after an actual examination of the country, or from knowledge of it, and is designated by a line on a map showing the general features of the adjacent country and the places through or by which it shall pass."

In this there is nothing said about the filing the map with the secretary of the interior as an act required in fixing the general route of plaintiff's road. But subsequently the court says:

"When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner of the general land-office or secretary of the interior, the law withdraws from sale or pre-emption the odd sections to the extent of forty miles on each side."

Here there is a plain distinction made between fixing the general route and the filing of a map with either of said officers; and the object of filing this map is stated, namely, the giving of the information that the general route has been fixed. Without doubt, information should have been given to the president of the fixing of the general route of plaintiff's road before he could be required to cause the land to be surveyed on both sides of the same. But I deny that there is any warrant for the claim that the law required that this map of the general route of plaintiff's road should be filed with the commissioner of the general land-office or the secretary of the interior, and that then the law stepped in and withdrew from sale, entry, or pre-emption the odd sections of land within 40 miles of the line of this general route upon the happening of this event. One of the

established rules for the construction of a statute is by the statute itself. In the third section of the act in which is found the grant to plaintiff there is made a clear distinction between the fixing of the definite route of plaintiff's road and the filing of a plat thereof with the commissioner of the general land-office. When the definite route is fixed, and a plat thereof filed in the office of the commissioner of the general land-office, the grant to plaintiff received precision, and attaches to the odd sections granted as of the date of the grant. Can it be that there is one mode of fixing the definite route o." plaintiff's road, and another in the fixing of its general route? Can it be that in fixing the definite route of plaintiff's road a map was required to be filed with the secretary of the interior or the commissioner of the general land-office, and then another map or plat of this fixed route, with a view of establishing and giving precision to the grant to plaintiff? But, whatever be required in fixing the general route of plaintiff's road, the statute does not give the effect to the act of filing a map of this route claimed for it. It would have no more force than as one of the acts fixing this route.

But it is urged that the land department of the government has given a construction to section 6, and that this is binding. The supreme court, in the case of *Swift Co.* v. *U. S.*, 105 U. S. 691, said upon this point:

"The rule which gives determining weight to contemporaneous construction put upon a statute by those charged with its execution applies only in cases of ambiguity and doubt." Citing *Edwards' Lessee* v. *Darby*, 12 Wheat. 206; *Smythe* v. *Fiske*, 23 Wall. 374; *U. S.* v. *Moore*, 95 U. S. 760.

And in the case of *U. S.* v. *Graham*, 110 U. S. 219, 3 Sup. Ct. Rep. 582, the supreme court says:

"Such being the case, it matters not what the practice of the departments may have been, or how long continued, for it can only be resorted to in aid of interpretation, and it is not allowed to interpret what has no need of interpretation. If there were ambiguity or doubt, then such a practice, begun so early and continued so long, would be in the highest degree persuasive, if not absolutely controlling, in its effect; but with language clear and precise, and with its meaning evident, there is no room for construction, and consequently no need of anything to give it aid."

The language in the sixth section in the act making the land grant to plaintiff under consideration is:

"And the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act."

The point about which discussion has centered in this case is what is meant by the words "odd sections of land hereby granted." Turning to section 3 of said act, we find what are the odd sections of land granted to plaintiff. It provides:

"There be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of the line of said railway, every alternate section of

public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office."

Does not this define what are the odd sections of land granted? And what better means of determining the meaning of words in an act than the act itself, when it defines the meaning thereof? The supreme court, in the case of *Neal* v. *Clark*, 95 U. S. 704, said, in speaking of a clause in an act:

"A passage will be best interpreted by reference to that which precedes and follows it."

In the case of *Kohlsaat* v. *Murphy*, 96 U. S. 153, the supreme court again said:

"In the exposition of a statute the established rule is that the intention of the law-maker is to be deduced from a view of the whole statute, and every material part of the same."

In Endlich on the Interpretation of Statutes will be found the same rules expressed for the interpretation of statutes.

There was something said in the argument in this case about the use of the term "odd sections," and it was urged that all that was necessary for congress to have said was, "the lands hereby granted," if it desired to specify in section 6 the lands described in section 3. The most that can be said in regard to the use of these words is, that they make the section unnecessarily particular in the description of the land to be affected. I have yet to learn, however, that unnecessary particularity of description of premises in a statute or deed made either ambiguous. It should be at all times observed that the terms "odd sections of land hereby granted" were used only in the attempt to describe the lands which were reserved from sale, entry, or pre-emption. That there seems to have been considerable dispute about the meaning of this section seems true. But a dispute about the construction of a statute does not always make an ambiguity, and not always a legal doubt as to its meaning; but when there is presented an ambiguity or legal doubt in considering the meaning of a statute, those called upon to construe it are not empowered to discard all rules established by the jurisprudence, which is our birthright, and proceed to establish a new and a different statute, and one not warranted by the language used. In this case there is a construction contended for which has the effect to obliterate from the statute the words "land hereby granted," and to substitute therefor: "Non-mineral land within forty miles of each side of the general route of plaintiff's road as it may adopt through the territories of the United States, and ten alternate sections of land per mile on each side of said general route whenever it passes through any state, and whenever on the line thereof

the United States have a full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the general route of said road is fixed." I sought to show in the former opinion I wrote in this case that to make that clause in that section read in that way would result in reserving from sale, entry, and pre-emption odd sections of land not granted, and leaving without said reservations odd sections of land which were granted in said section 3, as there was no provision that the fixed route of the road should be the same, even substantially, as the general route thereof, and that, as a matter of fact, in many places it was not. I furthermore sought to show that, as the grant to plaintiff was in the nature of a float until the definite route of the road was fixed, and a plat thereof filed in the office of the commissioner of the general land-office, "the odd sections of land granted" to plaintiff could not be reserved from sale, entry, or pre-emption, because until then they were not identified; for how could lands be reserved from sale, entry, or pre-emption until known and capable of description? I might have added that the construction of section 6 claimed by plaintiff left without force some of the exceptions to the grant in section 3, as far as were concerned the lands within the limits of the general route which correspond with those within the limits of the fixed route, because, in effect, under that construction they received their *status* when the general route was fixed. Non-mineral public lands not then sold, and which were free from pre-emption or other claims or rights, could not afterwards be sold or made subject to any entry or pre-emption claim or right. The effect of this would be that the grant to plaintiff would, as a matter of fact, attach to all such lands as were within the limits of its grant as were not sold, or subject to sale, entry, or pre-emption right at the time the general route of plaintiff's road became fixed; and in construing this part of section 3, which reads as follows: "And whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the directions of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections,"—the word "lawfully" must be inserted before at least each one of the words "sold," "occupied by homestead settlers, and pre-empted," for the said time mentioned in said clause refers to the time when the route of the road should be definitely fixed, and the plat thereof filed with the commissioner of the general land-office. Surely the language of PATTESON, J., in *Rex* v. *Burrell*, 12 Adol. & E. 465, cited in the previous opinion, recurs with force when considering this question:

"I see the necessity of not importing into statutes words which are not found there. Such a mode of interpretation only gives occasion to endless difficulty."

It was brought to the attention of the court that in an opinion given by Ex-Assistant Attorney General Smith upon the construction of said

section 6 he had held that some force should be given to the clause therein under discussion; that, after the fixed route of the road was made, and the plat thereof duly filed, the law conveyed the odd sections named in section 3, and this would leave that clause no function to perform if it applied to the lands described in said section. If this were so, it would not authorize that able officer to construct a new statute, and to disregard the established rules for constructing such a statute as this, and to ignore the meaning of words well known, and which were defined in the act itself. There is nothing unusual in finding in a statute words which might have been omitted.

Plaintiff was not to have a patent for the lands granted until each 25 miles of the road it might construct should be accepted or determined to be in accordance with the provisions of the act making the grant. When the land grant to plaintiff received precision by the establishing of the fixed route of its road, congress said then it shall not be subject to the general laws provided for the disposal of public lands, such as sale, entry, or pre-emption. This would prevent any cloud being placed upon the lands granted by the officers of the land department. I am led to this conclusion by what follows in that section. Evidently congress had its mind directed to the general laws for the disposal of public lands when considering that section. Commencing at the clause under discussion, and the section reads:

"And the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided by this act; but the provisions of an act of September, eighteen hundred and forty-one, granting pre-emption rights, and all acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May 20, eighteen hundred and sixty-two,' shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those granted to said company."

We have here the words "line of said road," not the line of the general route of said road. If Ex-Assistant Attorney General Smith had found upon examination that without this last-named clause in that section the general laws granting pre-emption rights and homestead rights applied to most of the lands not granted to plaintiff on the line of its road as soon as surveyed, I do not know what course he would have taken in his endeavor to find some function for that part of that section to perform, and what new meaning he would have found in the language thereof. The truth is that two statutes are often found covering the same ground. It is said that the object of the clause under consideration was to preserve the land after the location of the general route for the benefit of plaintiff, so that its grant might attach thereto. I know of no means of determining what the object of a statute is, other than by a reference to the language used; and I do not find this object manifested in that clause. As I have shown, I think "sale," "entry," and "pre-emption" are terms which apply to only particular modes of disposing of the public domain. But in the limitations upon plaintiff's grant we have the terms "granted, reserved, and otherwise appropriated."

It is singular, if congress intended to preserve these lands from the time of the fixing of the general route of plaintiff's road, that that body should have provided for preserving only from the disposal to those who would have to settle upon the same, make homes, and develop the country, and left them open to other modes of disposal. It was claimed that congress had approved of the decisions of the supreme court which had construed plaintiff's grant by the use of this language in an act approved March 3, 1887, 24 St. 556:

"That the secretary of the interior be, and is hereby, authorized to immediately adjust, in accordance with the decisions of the supreme court, each of the railroad land grants made by congress to aid in the construction of railroads, and heretofore unadjusted."

It would seem that, if congress meant that all land grants made to aid in the construction of railroads should be made to conform to the decisions of the supreme court as to their extent, it should have so declared directly itself, and not have passed a statute authorizing the secretary of the interior to so declare. It would seem, in my judgment, that there were some disputes about these grants, and congress authorized the secretary of the interior to settle them, and in so doing to be guided by the decisions of the supreme court bearing upon the subject in dispute. What those disputes were does not appear in the statute. The power to settle a dispute, and to make a land grant conform to a decision of a court, I apprehend, are not the same, but different, things. And with the view I have of the statute it will not bear the construction contended for by plaintiff.

Finally, plaintiff urges that, when one circuit court of the United States decides a point, all the others should conform their views to this decision, until the matter is settled by the rulings of the supreme court. But this is not the rule which prevails in the circuit courts of the United States. The very decision that counsel for plaintiff would have me consider as binding—*Denny* v. *Dodson*, 13 Sawy. 68, 32 Fed. Rep. 899—is an illustration showing that the rule contended for does not prevail. The very distinguished judge who delivered that opinion refused to be governed by a former decision of the very same court, rendered by the experienced and able Judge DEADY, upon a material point in regard to the nature of plaintiff's title to the land granted it. A United States circuit court undoubtedly always with reluctance will assert its right to disagree with the decision of another circuit court, even when satisfied that it is erroneous. I am aware that in refusing to concur with the opinions of many able jurists expressed upon the construction of said section 6, I, justly perhaps, subject myself to the charge of presumption. I trust not, however, to the charge of having arrayed myself with the growing army of cranks, who find so congenial a home in our republican society; for I have no desire to be other than conservative, and to adhere to the well-established rules for construing a statute of the class under consideration. In not one of the decisions referred to as supporting the views of plaintiff is there any discussion of the terms under consideration used in said section 6, and they shown to have the force claimed; in none of

them a reference to the established rules for construing such statutes. In the Bible there is the command: "Thou shalt not follow a multitude to do evil." Perhaps it is well to have some some one ask of the route we are following in the construction of statutes making legislative grants of the public domain, to the end that we may learn whether or not in such matters the old landmarks are to be discarded and new ones observed. For the above reasons I order that the previous judgment of this court shall stand and remain in force.