## WORK, SECRETARY OF THE INTERIOR, *v.* UNITED STATES EX REL. MOSIER ET AL.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 25. Argued April 20, 1922; restored to docket for reargument May 29, 1922; reargued February 27, 28, 1923.—Decided March 19, 1923.

1. Under the provision of the Act of June 28, 1906, directing that mineral rights of the Osage Indians shall be leased by the Tribal Council under rules prescribed by the Secretary of the Interior, and with his approval, but upon royalties determined by the President, bonuses procured, with the Secretary's approval, through auctioning the privilege of taking leases of particular tracts, were in effect a supplement to the royalties prescribed in advance by the President—part of the income of the property,—and are distributable to tribal members in the same way as the statute prescribes for the royalties. P. 357.

2. The question whether such bonuses are included in royalties is one of statutory construction, not finally entrusted to the discretion of the Secretary, but determinable in court at the instance of the beneficiaries as of right. P. 358.

3. The act directs that the *pro rata* share of an Osage minor in the income received by the United States for the Tribe from bonds, mineral leases, sale of extra lands, and grazing rents, shall be paid quarterly to the minor's parents until he becomes of age; and the discretion allowed to withhold payment when the Commissioner of Indian Affairs becomes satisfied that a minor's interest is being misused or squandered, cannot be enlarged by a general regulation of the Secretary declaring that such income is misused if not devoted solely to the care and use of the minor, and providing that only fifty dollars per month shall be paid his parents on his behalf unless upon a specific showing that his funds are being used for his specific benefit. P. 359.

4. It was the intent of the act that such income should go into the family funds for the support of the family and of the minor as part of the family. P. 361.

5. Subject to the rights of the distributees as defined by the statute itself, discretion is vested in the Commissioner to determine in each case whether there has been misuse or squandering, and what is

such; and to that end he may withhold further payments until an account has been rendered by the minor's parents showing how the last payments were used. P. 362.

6. Until there has been full opportunity for the exercise of this discretion, neither the Commissioner nor the Secretary of the Interior can be compelled by mandamus to make a payment. P. 362.

50 App. D. C. 219; 269 Fed. 871, reversed.

This writ of error brings in review a judgment of the Court of Appeals of the District of Columbia, affirming a judgment of mandamus against the Secretary of the Interior commanding him to pay to the relators all the moneys due their minor children, members of the Tribe of Osage Indians of Oklahoma, by reason of the distributions made under the Act of June 28, 1906, 34 Stat. 539, including their respective shares of bonus moneys paid the Secretary for oil leases made by the Tribal Council.

The relators are W. T. Mosier and Louisa Mosier, members of the Osage Tribe of Indians and enrolled as such under the Act of Congress of June 28, 1906, 34 Stat. 539, and are parents of John T. Mosier, Edwin P. Mosier, Luther C. Mosier and Agnes C. Mosier, also enrolled members of the same tribe, who are minors and in the care and keeping of the relators.

In their petition, after reference to the provisions of the law of 1906 and their history, they allege that the Secretary of the Interior has refused to pay them certain income due them under the statute as parents of these minors; and has imposed on payment thereof conditions and limitations unauthorized by the act and beyond his power to impose. The Secretary answered admitting his refusal, and asserting that under the statute he and the Commissioner of Indian Affairs were vested with a discretion to protect the interest of the minors, and that his refusal was in the exercise of that discretion. The facts are shown in the admissions in the pleadings and by a stipulation. They can be better understood after a state-

ment of the act whose construction is the subject-matter
of the controversy.

The Act of 1906, *supra*, entitled, "An Act For the di-
vision of the lands and funds of the Osage Indians in
Oklahoma Territory, and for other purposes," provided
for the enrollment of the tribe including minors, and for
the division of the land between them by selection, the
selection for the minors being made by their parents, but
forbade the sale of the oil, gas, coal or other minerals
covered by the lands, the minerals being reserved to the
use of the tribe for a period of twenty-five years, the
royalties to be paid to the tribe. The act directed that
the gas, oil, coal and other minerals should become the
property of the individual owner of the land at the end
of that period unless otherwise provided. Section three
of the act directs the leasing of oil, gas and other mineral
rights in these lands by the Tribal Council under such
rules and regulations as the Secretary may direct and with
his approval, provided " that the royalties to be paid to
the Osage tribe under any mineral lease so made shall
be determined by the President of the United States."
The effect of the act was to give to each member of the
tribe three selections of land, part of which was to be a
homestead and the remainder surplus land, all to be
farmed by him for twenty-five years and to become his
absolute property at the end of that time. Under § 4,
funds belonging to the tribe and derived from various
sources were to be held by the United States as trustee for
twenty-five years, and the interest as earned thereon was
to be divided between the members of the tribe. In addi-
tion, under the second paragraph of § 4, the royalty re-
ceived from oil, gas, coal and other mineral leases and all
moneys secured from the sale of town lots and other
lands of the tribe, and from rent of grazing lands, were
to be distributed to the members of the tribe as income,
payable quarterly. Thus the members of the tribe were

to share in two kinds of property, first, homesteads and farm lands and their proceeds, and, second, income from the sources above mentioned. So far as minors were concerned, the methods of distribution of the income from the two kinds were described in somewhat different language. The directions as to proceeds from lands is in § 7 as follows:

" That the lands herein provided for are set aside for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided; and said members, or their heirs, shall have the right to use and to lease said lands for farming, grazing, or any other purpose not otherwise specifically provided for herein, and said members shall have full control of the same, including the proceeds thereof: *Provided,* That parents of minor members of the tribe shall have the control and use of said minors' lands, together with the proceeds of the same, until said minors arrive at their majority: *And provided further,* That all leases given on said lands for the benefit of the individual members of the tribe entitled thereto, or for their heirs, shall be subject only to the approval of the Secretary of the Interior."

The first paragraph of § 4 prescribes the method of distributing the income from the second kind of property and directs that it shall be paid quarterly to the members entitled except in case of minors, in which case it shall be paid quarterly—

" to the parents until said minor arrives at the age of twenty-one years: *Provided,* That if the Commissioner of Indian Affairs becomes satisfied that the said interest of any minor is being misused or squandered he may withhold the payment of such interest: *And provided further,* That said interest of minors whose parents are deceased shall be paid to their legal guardians, as above provided."

For ten years, after the act, the sums due the minors were small and were evidently not more than enough to

furnish reasonable support of the minors by the parents; but thereafter by the increase in the value of the oil and gas properties, the income payable grew to such amounts that Secretary of Interior Lane, who was the first defendant herein, deemed it his duty to take action to prevent a sacrifice of the minors' income and through the Commissioner of Indian Affairs called for accounts from the parents of the manner of the disposition of minors' income paid them. He issued an order that the income should be devoted solely to the care and use of the minor whose income it was, that any other use would be misuse, and that no more than fifty dollars a month would be paid to the parents on account of a minor's share, unless a specific showing was made that the funds were being used for the specific benefit of each particular child. As already shown, the royalties on mineral leases were fixed by the President. As the mineral properties became more valuable and after a general lease known as the Foster Lease was ended, the practice was initiated with approval of the Secretary of putting up the privilege of leasing particular mineral properties at auction. Large sums as down payments in addition to the royalties as fixed by the President were realized, inuring to the benefit of the tribe. The Secretary held that these sums, called "bonuses," were not royalties but should be deposited in the Treasury as part of the trust funds for the tribe held by the United States and that only the interest therefrom should be distributed. The Comptroller of the Treasury ruled against this view at least so far as to hold that there was no authority of law for such an interest bearing deposit in the United States Treasury. 23 Comp. Dec. 483, 486. Nevertheless, the Secretary withheld payment of minors' interest therein from the parents. While it was admitted that many of the Osages are idle, wasteful, extravagant and improvident, it was also admitted that the relators were not so. The stipulation of facts

showed that at no time prior to the rendition of accounts by the relators under the order of April 26, 1917, had the Indian Commissioner ever determined that the relators had misused or squandered the funds, that relators' accounts theretofore showed that the funds paid them were providently expended for the direct use and benefit of the minors or were invested and retained for their ultimate use and benefit, but that since April 26, 1917, the relators had neglected and refused to render any accounting and the Commissioner had been without information on which to determine whether the funds were being misused or squandered.

*Mr. C. Edward Wright,* with whom *Mr. Edwin S. Booth* was on the brief, for plaintiff in error.[1]

*Mr. T. J. Leahy,* with whom *Mr. F. W. Clements* and *Mr. C. S. Macdonald* were on the brief, for defendants in error.

MR. CHIEF JUSTICE TAFT, after stating the case as above, delivered the opinion of the Court.

The questions presented are, first, the proper classification of bonuses under the statute, second, the validity of the conditions imposed by the Secretary on the payment of the minors' incomes to the parents, and third, the propriety of mandamus as a remedy in this case.

The bonus which was the result of bidding for desirable and profitable oil and gas leases secured for the members of the Osage Tribe the just value of the use of their property which the fixing of royalties in advance by the President was not adapted to give them. It was in effect a supplement to the royalties already determined. It was really part of the royalty or rental in a lump sum or down

---

[1] At the first hearing *Messrs. Wright and Booth* argued the case on behalf of the plaintiff in error.

payment.   We do not see how it can be classified as any-
thing else.   It was income from the use of the mineral
resources of the land.   Of course, it involved a consump-
tion and reduction of the mineral value of the land, but
so does a royalty.   This is an inevitable characteristic
of income from the product of the mine.   What was in-
tended to be distributed to the members of the tribe was
the income from the mineral deposits in their lands, and
the bonus was part of that.   Doubtless Congress had in
mind regular annual or quarterly equal payments when it
used the word royalties; and did not anticipate such large
down payments.   But in the unexpected event, we must
decide under what head the bonus is to be treated, whether
as capital or income, and it seems clear to us that, in view
of the entire statute, it is more aptly described by the
latter term.

Nor is the settlement of this question a matter of dis-
cretionary construction by the Secretary.   The Act of
June 28, 1906, 34 Stat. 539, was enacted to make a definite
disposition of the Osage Indians' resources.   Except those
which were sold outright or were kept as tribal lands for
grazing, all lands were divided between the members of
the tribe, adults and minors, share and share alike, for
individual use for every purpose except the production of
minerals, and at the end of twenty-five years the parcels
were to vest absolutely in the respective individuals or
their heirs.   On the other hand, the funds of the tribe
were to be kept by the United States in its treasury and
interest thereon was to be paid quarterly to the members,
share and share alike.   In addition to this interest, there
was also to be distributed as they fell due, the royalties
from leases of mineral rights, the proceeds of the sale of
certain lands already referred to and the rentals from the
grazing lands.   The question whether bonuses were to
be included in royalties is a matter of statutory construc-
tion, not finally entrusted to the discretion of the Secre-

tary, but determinable in court at the instance of the beneficiaries as of right.

Having thus determined that the duty of the Secretary to pay this income to the adult members of the tribe is ministerial, we come now to the question how much discretion the statute gives him in withholding payment from minors. In respect to the income from the distributed lands, the Secretary has no duty whatever. The lands of the minors are given over to the custody and use of the parents who can cultivate or lease them and apply the proceeds as they see fit. Congress evidently intended to trust to the natural disposition of the parents to look after and care for their children out of the proceeds, and to allow them to treat the proceeds of the inalienable lands as a family fund to be administered by them until the children should reach their majority. It was probably anticipated that the proceeds of a minor's land from agriculture only would not be large and could not greatly exceed, if indeed it would equal, the expense his care and support would entail on the family.

With respect to the payment of income from United States bonds, mineral leases, sale of extra lands and grazing rents, belonging to minors, Congress seems to have had a similar view; but it did vest in the Commissioner of Indian Affairs, subject to the supervision of the Secretary of the Interior, discretion to see that its confidence in the natural parental feeling as a motive for care of the minors' interest in such income should not be abused, and whenever he found misuse or squandering by the parents of the income, he was given authority to withhold payment.

The record shows that the Secretary enlarged this discretion vested in him and his subordinate into a power to lay down regulations, limiting in advance the amount to be paid to the parents to a certain monthly rate, and declaring that no use of the funds would be permitted which

did not inure to the separate benefit of the minor. He was led to take this action, which was a departure from the previous practice of the Department during the decade immediately following the passage of the act, because of the sudden increase in the income of the minors resulting from the bonuses given for mineral leases. However desirable such regulations were, in view of the changed circumstances, we think they were in the nature of legislation beyond the power of the Secretary. Congress has since met the need by an amendment to the Act of 1906 by the Act of March 3, 1921, 41 Stat. 1249.

The direction to the Secretary to pay to the parents the income due to the minors is clear and positive. It is that the income " shall be paid quarterly to the parents until said minor arrives at the age of twenty-one years." The proviso " That if the Commissioner of Indian Affairs becomes satisfied that the said interest of any minor is being misused or squandered he may withhold the payment " did not confer on him a power to determine in advance by general limitation a monthly rate in excess of which what was due minors should not be paid to parents, nor did it enable him to require before payment a showing that the income beyond such limited monthly rate was being used for the specific benefit of each child. Congress evidently intended that the Commissioner should through his agents keep track of the conduct of parents in the use of the income of their children and necessarily vested him and the Secretary with power to require an account of how the income was being used; but this was not a regulatory function to be exercised in advance of payment which is positively enjoined. The proviso imposes on the Commissioner the duty of supervising each case and determining from the circumstances whether there has been, in cases of payments made, misuse or squandering, and if so, of withholding further payment on account of it. No bond is required of the parents as would be in case of a

guardian to whom the income is to be paid in the absence of parents; and it was the evident purpose of Congress, in view of the then comparatively small amount of the probable income, to allow it when there was a family to go into the family funds for the support of the family and of the minors as part of the family. This was the intent in respect to the annual proceeds from the land allotted to the minors, and the same purpose may be inferred as to the income from the funds and royalties, qualified, of course, by the proviso in order to prevent a perversion or squandering of it which would defeat this purpose.

We come, then, in our view of the statute, to consider the correctness of the judgment of mandamus of the District Supreme Court as affirmed by the District Court of Appeals. The opinion of the Supreme Court which was adopted by the Court of Appeals closes as follows:

"The conclusion is that the second question must be answered to the effect that the respondent cannot limit the amount to be paid to the relators as the parents of their minor children from the moneys distributable to them under the law, but can require from them the submission of periodical statements of accounts showing in detail the expenditure of the moneys so received. With this limitation on the scope of the writ of mandamus prayed for, it will issue as prayed.

"And it is so ordered."

But the judgment actually entered and affirmed is as follows:

"Ordered and adjudged that the prayers of the petition be and the same are hereby granted and the writ of mandamus be issued herein directed to the respondent, commanding him to deliver, or cause to be delivered to the plaintiffs all the moneys due their minor children, members of the Tribe of Osage Indians of Oklahoma, by reason of the distributions made in virtue of the act of June 28, 1906 (34 Stat. 539), prior to the filing of the bill in

this cause. including their respective shares of bonus moneys distributable as royalties under said Act." ·

This is broad and unconditional and can not be sustained. The relators had refused and neglected to give an accounting of the funds last paid to them for the minors and the Commissioner and Secretary were entitled to withhold future payments until the Commissioner was by such accounting enabled to determine whether in his judgment there was a misuse or squandering of the income then being expended. The fact that, in the past the relators had satisfactorily accounted for money received is not sufficient. The Commissioner was entitled to the latest information before acting. The principles governing the issuing of the writ of mandamus in such cases have been much considered by us. *Hall* v. *Payne,* 254 U. S. 343; *Alaska Smokeless Coal Co.* v. *Lane,* 250 U. S. 549; *Ness* v. *Fisher,* 223 U. S. 683; *Riverside Oil Co.* v. *Hitchcock,* 190 U. S. 316. Subject to the construction we have put upon the statute, the discretion is vested in the Commissioner to determine in each case whether in his judgment there has been misuse or squandering, and within the same limitation, to decide what is misuse or squandering. Until he has had a full opportunity to exercise this discretion, neither he nor the Secretary can be compelled by mandamus to make the payment, and if in its exercise, he does not act capriciously, arbitrarily or beyond the scope of his authority, the writ will not issue at all.

Our conclusion is that the petition for the mandamus in this case should be dismissed without prejudice to the filing of another petition after the relators shall have made the requisite accounting of the moneys of the minors paid them down to the date of filing, and shall have submitted the same to the Commissioner, and after the failure, if there be such, of the Commissioner and the Secretary within a reasonable time to exercise the discretion vested in them under the statute as we have con-

strued and limited it in the foregoing opinion. The case is, therefore, reversed and remanded to the Supreme Court of the District with instruction to dismiss the petition accordingly.

*Reversed.*