## FERGUSON v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6029.

Circuit Court of Appeals, Fifth Circuit.

Dec. 13, 1930.

Robert Ash, of Washington, D. C., and Harry C. Weeks and A. H. Britain, both of Wichita Falls, Tex. (T. J. Reilly, of Washington, D. C., on the brief), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key and A. H. Conner, Sp. Assts. to Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and R. N. Shaw, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., and J. Louis Monarch, Sp. Asst. to Atty. Gen. (J. Louis Monarch and A. H. Conner, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before BRYAN and FOSTER, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Petitioner, a married man, inherited certain real property, which under the law of Texas became his separate property. During the year 1919 he negotiated a number of oil and gas leases thereon from which cash bonuses were received as follows: In 1922, $96,388.84, in 1923, $74,111.16, and in 1924, $1,869.45, as well as large sums in each of these years and the year 1925 as royalties. When the leases were executed he agreed with his wife that she should share equally the proceeds of any oil produced. All of the funds so derived were placed in petitioner's bank account, the wife having no separate account, but they each drew checks thereon, the wife signing those drawn by her, "W. P. Ferguson by Mrs. Ferguson."

Petitioner and his wife filed separate returns, in which the royalties and cash bonuses were reported as community income, to be taxed as capital gain, under section 206 of the Revenue Act of 1921 (42 Stat. 232). He also claimed an earned income of $10,000 and $20,000 for the years 1924 and 1925, respectively. The Commissioner, upon an audit of the returns, held all of the funds so received to be the separate property of the petitioner and taxed the same as ordinary income after allowing a credit of only $5,000 for earned income. Petitioner seeks a reversal of that ruling.

The questions presented, therefore, are as follows:

(1) Did the cash received as bonuses and the royalties from the leases constitute capital gain, to be taxed as contended by petitioner, or were they ordinary income from the property?

(2) Were these funds, under the facts of the case, community income or the separate revenue of the husband?

(3) Was the petitioner entitled to any greater allowance for earned income than was found by the Commissioner?

The answer to the first question depends, at least in so far as the cash consideration is concerned, upon whether or not the transfers amounted to sales and the vesting in the transferees of title to real property. If so, then the sums so realized were taxable under section 206 of the Revenue Act of 1921. That section defines "capital gain" as "gain from the sale or exchange of capital assets consummated after December 31, 1921." The lands in question undoubtedly represented a capital asset, the sale of any part of which at a profit produced a capital gain. The statute makes no attempt to define a sale, but it is defined by the lexicographers as follows:

Webster's International Dictionary:

"Act of selling; a contract whereby the absolute, or general, ownership of property is transferred from one person to another for a price, or sum of money, or loosely for any

consideration; also a contract for such transfer of ownership in the future or upon the future fulfillment of some condition (this being by some differentiated as an agreement to sell)."

Black's Law Dictionary:

"A contract between two parties, called, respectively, the 'seller' (or vendor) and the 'buyer' (or purchaser), by which the former, in consideration of the payment or promise of payment of a certain price in money, transfers to the latter the title and possession of an object of property."

Bouvier's Law Dictionary:

"An agreement by which one of two contracting parties, called the seller, gives a thing and passes the title to it, in exchange for a certain price in current money, to the one party, who is called the buyer or purchaser, who on his part, agrees to pay such price. 2 Kent 363; Pothier, Vente n. 1.

"Ordinarily, a transfer of property for a fixed price in money, or its equivalent. [Five Per Cent. Cases], 110 U. S. 471 [4 S. Ct. 210, 28 L. Ed. 198]; [Northern Pac. R. Co. v. Sanders (C. C.)] 47 F. 604."

The Supreme Court of the United States has also defined "a sale" in very much the same way, in Williamson et al. v. Berry, 8 How. 495, 544, 12 L. Ed. 1170, wherein it is said: "Sale is a word of precise legal import, both at law and in equity. It means at all times, a contract between parties, to give and to pass rights of property for money,— which the buyer pays or promises to pay to the seller for the thing bought and sold."

Of course Congress could, if it saw fit, declare what was meant, and the federal courts are not bound by the decisions of the states on questions of general law. But the word "sale" seems to have the same meaning wherever used, and, as to the interest or the title which was conveyed by the transfers under inquiry, we think reliance must be had upon the law of Texas. It is settled by the jurisprudence of that state that such a conveyance vests a fee title in the minerals themselves, and this has become a rule of property in Texas, which could not be changed as to vested interests. Texas Company v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989; Stephens County v. Mid-Kansas Oil & Gas Company, 113 Tex. 165, 254 S. W. 290, 29 A. L. R. 566; Humphreys-Mexia Oil Company v. Gammon, 113 Tex. 255, 254 S. W. 296, 29 A. L. R. 607; Estate of W. T. Waggoner v. Sigler Oil Co., 118 Tex. 509, 19 S.W.(2d) 27. The Treasury Department has likewise recognized this effect by collecting upon such transfers in that state the federal stamp tax imposed upon sales of real property, amounting to many thousands of dollars. In this situation we can see no escape from the conclusion that in each of the transactions in question here there was a conveyance in fee of seven-eighths of the minerals in place for which the cash consideration was paid as the price of a capital asset. The Board of Tax Appeals has likewise recognized that result where the lessee or vendee of a mineral lease has subsequently conveyed either the whole or part of the title so acquired. Murphy v. Commissioner, 9 B. T. A. 610; In re Reynolds, 10 B. T. A. 651. In the present case the Board cited, in support of its decision, the cases of Stratton's Independence v. Howbert, 231 U. S. 399, 34 S. Ct. 136, 58 L. Ed. 285; Stanton v. Baltic Mining Co., 240 U. S. 103, 36 S. Ct. 278, 281, 60 L. Ed. 546; Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 208, 61 L. Ed. 460; and United States v. Biwabik Mining Co., 247 U. S. 116, 38 S. Ct. 462, 62 L. Ed. 1017. However, each of those decisions involved the excise tax laid upon corporations by the act of 1909. The court was called upon to determine what was meant by the word "income" as used therein. It was simply held that, for the purposes of that particular statute, mining was manufacturing, and the result from such an operation was income, although it involved the gradual consumption or exhaustion of the minerals, and to that extent a conversion of the property; and further that the word "depreciation" should be given its ordinary meaning, which was not the same as "depletion" or exhaustion of the minerals. In fact, it was clearly pointed out that the tax was not upon property but upon the results of a business, as indicated in Stanton v. Baltic Mining Company, supra, from which we quote as follows: "It [appellant's contention above outlined] moreover rests upon the wholly fallacious assumption that, looked at from the point of view of substance, a tax on the product of a mine is necessarily in its essence and nature in every case a direct tax on property because of its ownership, unless adequate allowance be made for the exhaustion of the ore body to result from working the mine. We say wholly fallacious assumption because, independently of the effect of the operation of the 16th Amendment, it was settled in Stratton's Independence v. Howbert, 231 U. S. 399, 34 S. Ct. 136, 58 L. Ed. 285, that *such tax is not a tax*

*upon property as such because of its ownership, but a true excise levied on the results of the business of carrying on mining operations."* (Italics by the writer of the present opinion.)

In the Revenue Acts passed after the adoption of the Sixteenth Amendment, this capital asset, representing the investment in minerals in land, was recognized and allowance made therefor. Attention was called to this fact by the Supreme Court, in Von Baumbach v. Sargent Land Co., supra, wherein it was said: "It may be admitted that a fair argument arises from equitable considerations that, owing to the nature of mining property, an allowance in assessing taxes upon income should be made for the removal of the ore deposits from time to time. Congress recognized this fact in passing the income tax section of the Tariff Act of 1913 (§ II, 38 Stat. at L. 166, 167, chap. 16, Comp. Stat. 1913, §§ 6319—6322), when it permitted 'a reasonable allowance for the exhaustion, wear and tear of property arising out of its use or employment in the business, not to exceed, in the case of mines, 5 per centum of the gross value at the mine of the output for the year for which the computation is made;' and in the Income Tax Law of September 8, 1916 (1915—1916 Stat. 756, 769), a reasonable allowance is made in the cases of mines for depletion thereof, 'not to exceed the market value in the mine of the product thereof which has been mined and sold during the year for which the return and computation are made.' These provisions were not in the Act of 1909, and, as we have said, we think that Congress, in that act, used the term 'depreciation' in its ordinary and usual signifiance. We therefore reach the conclusion that no allowance can be made of the character contended for as an item of depreciation."

The Revenue Act nowhere else makes provision for deduction of the value of this capital asset when realized from a transfer of this character. The amendment embraced in section 202 of the Revenue Act of 1921 (42 Stat. 229) appears to have been intended to relieve taxpayers from the heavy burden of the higher brackets of the income tax law where capital assets were sold because of its stifling effects upon business. If the taxpayer is denied the benefit of this section, then he will be compelled to pay the higher tax upon the whole of the sums so realized, although they represent the price of property the title to which he has conveyed. That such an interest is property, within the meaning of the income tax acts, is settled by the Supreme Court in the case of Lynch v. Alworth-Stephens Company, 267 U. S. 364, 45 S. Ct. 274, 69 L. Ed. 660. The price paid petitioner in cash was unconditional and irrevocable, whether minerals were discovered and produced or not; but even though the right constituted a mere hope, it was property, possessing such value as those desiring to explore were willing to pay for it.

Reference has also been made, in the opinion of the Board, to the case of Work v. U. S. ex rel. Mosier, 261 U. S. 352, 43 S. Ct. 389, 391, 67 L. Ed. 693, as holding that bonuses are anticipated royalties and should be classified as such. That was a case interpreting the Act of June 28, 1906, 34 Stat. 539, dealing with the lands of the Osage Indians, which forbade the sale of said property or the minerals therein for a period of twenty-five years, but authorized their development for mineral purposes, and declared that income therefrom should be distributed among the members of the tribe. It was further provided "that the royalties to be paid to the Osage Tribe under any mineral lease so made shall be determined by the President of the United States." Section 3. After the discovery of oil a practice was adopted by the Interior Department of awarding the leases to the highest bidder, who would pay a cash consideration in addition to the royalties, which resulted in the realization of considerable sums. The court held that this was income stating incidentally that it was in the nature of anticipated royalties. Finally, it was said: "What was intended to be distributed to the members of the tribe was the income from the mineral deposits in their lands, and the bonus was part of that. Doubtless Congress had in mind regular annual or quarterly equal payments when it used the word 'royalties,' and did not anticipate such large down payments. But in the unexpected event, we must decide under what head the bonus is to be treated, whether as capital or income, and it seems clear to us that, *in view of the entire statute, it is more aptly described by the latter term."* (Italics by the writer.) The court was there concerned with a situation which apparently had not been anticipated by Congress in the passage of the act, as was pointed out by Chief Justice Taft, and had to determine whether the funds so received were income. The question was whether the bonus should be classified under the second paragraph of section 4 as money to remain on deposit for twenty-five years, the interest on which only

could be distributed, or under the third paragraph as income. There was no occasion to consider the provisions of the Revenue Law with which we are now dealing. The latter makes a clear distinction between income derived from capital gain and that arising from the ordinary revenues or profits of business. The situation here is decidedly different from the case just mentioned, for we are attempting to classify the particular income according to the reasonable intendment of an act which by the amended section was designed to relieve the taxpayer from some of the heavier burdens of taxation where the gain arises from a conversion of his assets into cash.

We conclude that the bonuses or cash payments for the leases were capital gains and taxable as such.

On the other hand, royalties represent the retained interest of the lessor or vendor in the property or minerals which he receives from time to time as revenues under the contract. He did not convey that interest under the deed or lease, but provided that he should receive a fraction of the minerals themselves as produced. This part of his capital asset is protected and returned by another provision of the Revenue Act 1921, to wit, section 214 (a), 42 Stat. 239, which allows an annual deduction for depletion, based upon production and the estimated life of the pool or deposit. For this reason, the royalties cannot be considered as a capital gain.

We agree with the Board of Tax Appeals that the facts of the case do not warrant holding that there was an effective transfer to the wife of an interest in the funds. They remained at all times under the control and dominion of the husband. The agreement was one which he could ignore or carry out without the wife having any recourse.

With respect to the contention that the funds represented by bonuses were rents and revenues and therefore fell into the community, although arising from the separate property of the husband, it is at once apparent that such an argument conflicts with the assertion that they were capital gains. Having found that they fell within the latter category, it would seem to follow that they represented the corpus of the husband's separate estate rather than income of the character which belonged to the community. Stringfellow v. Sorrells, 82 Tex. 277, 18 S. W. 689; Evans v. Purinton, 12 Tex. Civ. App. 158, 34 S. W. 350; Arnold v. Leonard, 114 Tex. 535, 273 S. W. 799. The Texas courts have held that royalties from the separate property of the husband do not fall into community. Stephens v. Stephens (Tex. Civ. App.) 292 S. W. 290.

We are likewise of the opinion that the facts sustain the board's finding as to the earned income of the petitioner.

The petition is therefore granted, and the cause remanded for further proceedings in accordance with the views herein expressed.