Marrs McLean, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Verna Hooks McLean, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 77419, 77420, 81391, 81392, 86804, 86805, 94402, 94403.

Promulgated March 8, 1940.

*W. A. Bolinger, Esq.*, and *L. J. Benckenstein, Esq.*, for the petitioners.

*James H. Yeatman, Esq.*, and *M. L. R. Wade, Esq.*, for the respondent.

### OPINION.

MURDOCK: The Commissioner has determined deficiencies in the petitioners' income taxes as follows:

| Year | Marrs McLean | Verna Hooks McLean |
|---|---|---|
| 1930 | $3,603.79 | $3,540.05 |
| 1931 | 30,531.54 | 30,531.54 |
| 1932 | 67,475.45 | 67,475.45 |
| 1933 | 34,460.63 | 34,460.64 |
| 1934 | 37,682.43 | 37,682.43 |
| 1935 | 39,025.81 | 38,610.93 |

The questions presented for decision are:

1. Whether payments received under provisions (a) and (b) of a contract dated March 18, 1931, with the Yount-Lee Oil Co., which payments totaled $300,000 in 1931 and $200,000 in 1932, and additional payments received under provision (c) of that contract, during the years 1931 to 1935, inclusive, were proceeds from the sale of capital assets or whether they were ordinary income, and, if they were not proceeds from the sale of capital assets, whether the provisions of section 102 of the Revenue Acts of 1928 and 1932 apply.

2. Whether or not the petitioners are entitled to deductions for percentage depletion based upon sums received by them pursuant to certain agreements with the Gulf Production Co., and, if they are entitled to depletion, should it be computed as a percentage of the gross proceeds from the sale of production from the properties or as a percentage of the actual amount received by the petitioners from the properties.

3. Whether or not the petitioners are entitled to a deduction for percentage depletion based upon the sum of $65,000 received in 1935 as advance royalty or bonus upon the assignment of an oil and gas lease to the Humble Oil & Refining Co.

4. Whether or not the income of the trusts created on December 29, 1934, by the petitioners is taxable to them as community income for 1935.

The remaining issues raised by the pleadings have been settled by stipulation. All of the facts have been stipulated and the Board adopts the stipulated facts as its findings of fact.

The petitioners have resided in the State of Texas as husband and wife at all times material hereto. All of their income is community income. They filed separate returns for each of the years 1930 to

1935, inclusive, with the collector of internal revenue for the first district of Texas at Austin, Texas. They kept their books and reported their income during those years on a cash receipts basis.

## Issue No. 1.

The petitioners in 1919 leased land in Texas for the exploration and production of oil, gas, and other minerals. The leases are known as the Cade leases. The petitioners, lessees, agreed to allow the lessors a royalty of one-eighth of all oil saved from that produced and one-eighth of the net proceeds from the sale of gas, sulphur, and other minerals. The petitioners drilled a number of wells on the Cade leases between October 1927 and March 18, 1931, from which the production of oil was developed in commercial quantities. The principal value of the Cade leases was demonstrated by prospecting, exploration, and discovery work done by the petitioners during that period.

The petitioners, on March 18, 1931, entered into a contract with the Yount-Lee Oil Co. (hereinafter called Yount-Lee) with respect to the Cade leases, the pertinent provisions of which are as follows:

Now, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That I, the said Marrs McLean, of Jefferson County, Texas, hereinafter called "Grantor," for the consideration hereinafter set forth (and subject to the royalty reservation hereinafter contained), have GRANTED, SOLD, CONVEYED, TRANSFERRED AND ASSIGNED and do by these presents GRANT, SELL, CONVEY, TRANSFER AND ASSIGN unto the YOUNT-LEE OIL COMPANY, a corporation duly incorporated under the laws of the State of Texas, with its principal office at Beaumont, Jefferson County, Texas, the following described oil, gas and mineral leases and the oil, gas and mineral leasehold estates created thereby (together with the hereinafter described physical properties and equipment) covering the following described lands in Galveston County, Texas, to-wit:

[Here follows a description of the property transferred.]

The consideration for this transfer and assignment of said above-described oil, gas and mineral lease and physical property and equipment, is as follows:

(a) The sum of ONE HUNDRED THOUSAND ($100,000.00) DOLLARS cash, receipt of which is hereby acknowledged by Grantor;

(b) Two HUNDRED THOUSAND ($200,000.00) DOLLARS due and payable six (6) months after the date hereof, and Two HUNDRED THOUSAND ($200,000.00) DOLLARS due and payable twelve (12) months after the date hereof; said deferred payment to bear no interest;

(c) Two MILLION ($2,000,000.00) DOLLARS to be paid out of one-eighth ($\frac{1}{8}$) of the (gross) oil produced and saved from the lands covered by this assignment, if, as and when produced and saved, and only in such event; it being expressly understood in this connection that said YOUNT-LEE COMPANY shall be under no obligation whatever to Grantor herein to drill upon or develop said land, or any part thereof, for oil.

There is reserved and excepted from this assignment a royalty of twenty-five (25%) per cent of the oil produced and saved from the lands covered by this assignment, out of which twenty-five (25%) per cent royalty all outstanding

royalties (including royalties due lessors under the terms of said leases) and all overriding royalties are to be paid, and Grantor is to receive the balance of said twenty-five (25%) per cent royalty; it being understood in this connection that said YOUNT-LEE OIL COMPANY shall in any event be entitled to receive seventy-five (75%) per cent of the oil produced and saved from said land, and that all outstanding royalties, overriding royalties and/or interests of any character in the oil in, under or produced from said land shall be charged against the twenty-five (25%) per cent royalty herein reserved. Said YOUNT-LEE OIL COMPANY shall be entitled to free fuel oil for all operations on said land and the royalty shall be computed after deducting oil used for fuel. Grantor also reserves a royalty of twenty-five cents (25¢) per long ton on sulphur but Grantor shall be under no obligation to develop said land for sulphur.

The Cade leases were thereafter operated by Yount-Lee in accordance with the foregoing contract. That company drilled numerous wells on the leased property. Those wells produced and still are producing large quantities of oil.

The cash payments provided for in the contract were paid to the petitioners by Yount-Lee as follows: $100,000 on the date of the execution of the contract, $200,000 on September 18, 1931, and $200,000 on March 18, 1932. Payments on account of the $2,000,000 to be paid out of one-eighth of the oil produced and saved, were made as follows:

| | |
|---|---|
| 1931 | $7,144.09 |
| 1932 | 109,363.36 |
| 1933 | 127,323.22 |
| 1934 | 189,917.34 |
| 1935 | 105,075.56 |

The petitioners, on their income tax returns for the years here in question, reported the payments received under provisions (a), (b), and (c) of the contract of March 18, 1931, as proceeds from the sale of capital assets. The Commissioner, in determining the deficiencies, held that those payments were not proceeds from the sale of capital assets, but were ordinary income subject to both normal tax and surtax. He allowed deductions for percentage depletion based upon those amounts.

The petitioners during the taxable years also received payments representing the one-eighth overriding royalty which they reserved, and an interest in the one-eighth royalty reserved by the original lessors, which the petitioners acquired by assignment. Those payments were reported as ordinary income, and deductions for percentage depletion based upon those payments were claimed and allowed. The manner of reporting those payments and the deductions allowed for depletion based on those payments is not in issue in these proceedings.

The contention of the petitioners is that their "transaction [of March 18, 1931, with Yount-Lee] was an absolute sale of all of the McLeans' right, title and interest in the leases transferred, the estates created thereby, and in 75 per cent of all of the oil to be and which was produced therefrom." They claim that they retained no interest in that 75 percent of the oil; they sold that interest for payments of $500,000 under provisions (a) and (b) and payments under provision (c) which were to continue until $2,000,000 had been paid out of one-eighth of the oil produced and saved from the lands covered by the leases; and they are entitled to report those amounts as proceeds from the sale of capital assets. They make this argument in direct opposition to that of the Commissioner, which is that the petitioners received the payments as ordinary income; they did not sell their interest in that part of the oil; but retained in it, or in a part of it at least, an economic interest which entitles them to deductions for depletion.

The petitioners argue that their contract of March 18, 1931, was a sale under the laws of Texas. The effect of their contract under the laws of Texas is not determinative of whether the transaction was a sale within the capital gain provisions of the revenue act. The Supreme Court, in discussing similar provisions of an earlier act, had the following to say in *Burnet* v. *Harmel*, 287 U. S. 103:

But § 208 neither says nor implies that the determination of "gain from the sale or exchange of capital assets" is to be controlled by state law. For the purpose of applying this section to the particular payments now under consideration, the Act of Congress has its own criteria, irrespective of any particular characterization of the payments in the local law. See *Weiss* v. *Wiener*, *supra*, p. 337 [279 U. S.]. The state law creates legal interests but the federal statute determines when and how they shall be taxed.

The acts of the parties as shown in division orders, monthly statements, accounts, and income tax returns were inconsistent and are of little aid in deciding the present issue.

The decision of this issue turns upon the question of whether the petitioners stand as vendors of 75 percent of the oil, or whether they stand as producers of minerals, retaining and still owning an economic interest in that oil, or in a portion of it, within the meaning of the revenue acts and the decisions of the Supreme Court. This same question has arisen and has been decided in a number of cases. Cf. *Charles Pettit*, 41 B. T. A. 264. Where a party has retained an economic interest in the minerals in place, his income from those minerals is ordinary income and he is entitled to a deduction for depletion. But where he disposes of his entire economic interest in the minerals in place, he has made a sale, he is not entitled to depletion, and the amounts which he receives may be taxable as capital gain. The parties

disagree only as to how the facts in the present case fit into these principles.

The facts in the present case are similar in some important respects to those in the case of *Palmer* v. *Bender*, 287 U. S. 551. For the facts in the *Palmer* case see 49 Fed. (2d) 316. See also *L. T. Waller*, 16 B. T. A. 574. There was in each case a cash payment, a further cash payment to be made solely out of a percentage of the oil, and a one-eighth royalty, all payable to the taxpayers over and above a one-eighth royalty reserved by the original lessors. The contract in each case purported to sell an interest in a lease. All payments which Palmer received were reported by him as ordinary income and he claimed deductions for depletion under section 214 (a) (10) of the Revenue Act of 1921. Article 215 of Regulations 62 allowed the lessor of an oil and gas well a deduction for depletion based upon the bonus and royalties received from the lessee. But the Commissioner refused to allow Palmer deductions for depletion, because he thought the transaction was a sale of the lease by Palmer and his partners. The Supreme Court said that the partners had retained a capital investment in the oil in place, an economic interest in the oil in place, because of their retention of royalties, and, further, that not only the one-eighth royalty, but also the payments to be made from the proceeds of a percentage of the first oil produced and saved and the the cash payment, were all royalties, a return of the capital investment in the oil resulting in a diminution in the unit depletion allowance upon the oil later to be produced under the royalties. The result was the allowance of deductions for depletion based upon all of those payments.

Another case on the subject is that of *Thomas* v. *Perkins*, 301 U. S. 655. There the owners of oil and gas leases subject to a one-eighth royalty entered into an agreement purporting to "sell" all of their rights and interests in five-eighths of the leases to Perkins. They received a cash payment and were to receive an additional amount out of one-fourth of the oil produced and saved from the premises. Perkins drilled wells and produced oil. He did not include in his income any part of the proceeds that went to his assignors. The Commissioner included those amounts in his income and allowed him depletion based upon those amounts. The Court said that its decision in *Palmer* v. *Bender*, *supra*, supported the view that the assignment did not transfer the one-fourth of the oil in question. It also stated that the provisions for percentage depletion in the later acts are not to be distinguished from the provisions considered in *Palmer* v. *Bender*, because, to entitle one to depletion under either, ownership of oil by that person was essential, citing *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312. It pointed out that the assignors had an economic interest in one-fourth of the oil and were

entitled to depletion in respect to that oil. The Court held that the payments made by Perkins to the assignors was their income and not that of Perkins.

Harmel, the taxpayer in *Burnet* v. *Harmel, supra,* owned lands in fee, and as lessor executed oil and gas leases of those lands. He received a cash payment and was to receive royalties measured by production. He reported the cash payments as gain from the sale of capital assets. The Commissioner treated the payments as ordinary income and allowed deductions for depletion. The following quotation is from the last paragraph of the opinion of the Supreme Court:

The court below thought that the bonus payments, as distinguished from the royalties, should be treated as capital gain, apparently because it assumed that the statute authorizes a depletion allowance upon the royalties alone. See *Ferguson* v. *Commissioner*, 45 Fed. (2d) 573, 577. But bonus payments to the lessor have been deemed to be subject to depletion allowances under § 214a (9), Revenue Act of 1924, by Art. 216, Treasury Regulations 65, as well as under earlier acts. § 214a (10), Revenue Act of 1921, Art. 215, Treasury Regulations 62. * * * We see no basis for it [the distinction]. Bonus and royalties are both consideration for the lease and are income of the lessor. We cannot say that such payments by the lessee to the lessor, to be retained by him regardless of the production of any oil or gas, are any more to be taxed as capital gains than royalties which are measured by the actual production. See *Work* v. *United States ex rel. Mosier*, 261 U. S. 352, 357–358.

The petitioners argue that their case is unlike the cases above referred to and is in line with *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372; *Blankenship* v. *United States*, 95 Fed. (2d) 507; and *United States* v. *Spalding*, 97 Fed. (2d) 697, wherein it was held that no economic interest in the oil in place was retained by and consequently no deduction for depletion was allowable to the taxpayers. The *Spalding* case is easily distinguishable, for there, as the court pointed out, the taxpayer was never the owner or lessee of the property, never produced any oil or gas therefrom, could not have produced any oil or gas therefrom, and did not have any capital investment in the oil or gas in place.

The other two cases are also distinguishable upon their facts. The taxpayer in the *Elbe* case conveyed all of its interest in certain oil properties, including leases, to the Honolulu Co., for specified cash payments and one-third of the net profits resulting from production and operation. The agreements provided that the taxpayer was to have no interest in the properties. The taxpayer claimed deductions for depletion based upon the payments which it received. The Government contended that the transaction was a sale of capital assets. The following quotation from the opinion of the Supreme Court, is self-explanatory:

We agree with the conclusion of the Board of Tax Appeals that the contract between the respondent and the Honolulu Company provided for an absolute sale of all the properties in question, including all the oil and gas in place, and

that respondent did not retain any interest or investment therein. The aggregate sum of $2,000,000 was paid as an agreed purchase price to which was to be added the one-third of the net profits payable on the conditions specified. We are unable to conclude that the provision for this additional payment qualified in any way the effect of the transaction as an absolute sale or was other than a personal covenant of the Honolulu Company. See *Helvering* v. *O'Donnell*, ante, p. 370. In this view, neither the cash payments nor the agreement for a share of subsequent profits constituted an advance royalty, or a "bonus" in the nature of an advance royalty, within the decisions recognizing a right to the depletion allowance with respect to payments of that sort. Such payments are made to the recipient as a return upon his capital investment in the oil or gas in place. See *Burnet* v. *Harmel*, 287 U. S. 103, 111, 112; *Murphy Oil Co.* v. *Burnet*, 287 U. S. 299, 302.

The facts in the *Blankenship* case were similar to those in the *Elbe* case. There likewise the court held that the taxpayer had sold his entire interest in the minerals in the ground, the cash and the share of the profits were purchase price, and his right to receive profits was not secured by any retained interest in the minerals but was dependent entirely upon the personal covenant of the assignee.

A study of these cases and others shows that the courts have drawn a distinction between contracts in which the consideration is cash and a share of the profits from the operation of the properties, without the retention of any interest in the oil in place, on the one side, and contracts where the assignment is made in consideration of cash and an additional amount of cash payable solely out of a percentage of the oil and gas to be produced from the property. Cf. *Charles Pettit*, *supra*. They have held that transactions of the first kind result in an absolute sale, whereas transactions of the other kind do not result in a sale, since an economic interest in the oil is retained. The facts in the present case bring it within the second class, for here there was not only a payment of a stated amount to be made solely from a percentage of the oil to be produced but there was, in addition, a royalty payable to the assignors, as there was in the *Palmer* and *Perkins* cases. Cf. *Commissioner* v. *Fleming*, 82 Fed. (2d) 324.

The petitioners make an alternative contention in case the Board holds that the payments are not capital gains. The alternative contention is that section 102 (a) of the Revenue Acts of 1928 and 1932 applies to the tax on the payments received during 1931, 1932, and 1933. The statutory provision is as follows:

SEC. 102. SALE OF MINES AND OIL OR GAS WELLS.

(a) In the case of a bona fide sale of mines, oil or gas wells, or any interest therein, where the principal value of the property has been demonstrated by prospecting or exploration and discovery work done by the taxpayer, the portion of the tax imposed by section 12 of this title attributable to such sale shall not exceed 16 per centum of the selling price of such property or interest.

This section gives relief from surtaxes in some cases where section 101 does not apply. However, it does not apply to the tax on all

receipts under oil and gas leases but applies only where there has been a sale and taxable income attributable to that sale. Cf. *Burnet v. Harmel, supra*, where the Court said: "It is evident that the taxation of the receipts of the lessor [under an oil and gas lease] as income does not ordinarily produce the kind of hardship aimed at by the capital gains provision of the taxing act" because the abstraction of the oil is usually a time-consuming operation and the payments, unlike those in the case of a sale, are spread over a period of years. Section 102 (a) was not intended to give relief where an interest in the minerals was retained and the taxpayer was entitled to depletion. Cf. *Anna Taylor*, 3 B. T. A. 1201. Here there was no sale (see discussion of the main point in this first issue and the cases cited and discussed). The determination of the Commissioner is sustained on this, the first, issue.

Perhaps it should be mentioned, before leaving this issue, that the contract of March 18, 1931, purported to sell material and equipment used on the premises. However, the petitioners do not make any point of this circumstance and the stipulated facts do not indicate what part, if any, of the amounts in controversy were attributable to a sale of the equipment. Cf. *Columbia Oil & Gas Co.*, 41 B. T. A. 38.

## Issue No. 2.

The petitioners, prior to the taxable years, entered into separate agreements purporting to sell and assign four oil and gas leases known as the Phoenix, Antoine, Turner, and Gray leases. The other party to the contracts will be referred to, for convenience, as Gulf. The contracts covering the first three leases provided that the petitioners sell and convey to Gulf all of their right, title, and interest in the leases for a cash payment and a stated percentage of the net profits from the operation of the leases, after the payment of all development and operating costs, if, as, and when such net profits were derived by Gulf. Gulf was under no obligation to drill or develop the leases.

Gulf drilled wells on all of the leases and produced oil in commercial quantities during the years 1930, 1931, 1932, and 1935. The petitioners received their share of the net profits from the operations in accordance with the contracts. Royalties payable to the original lessors were deducted by Gulf before computing the net profits shared in by the petitioners. The petitioners reported the amounts received from Gulf under these leases as ordinary income and claimed deductions for depletion equal to $27\frac{1}{2}$ percent of a percentage of the gross proceeds realized by Gulf from the oil produced. The Commissioner, in determining the deficiencies, allowed depletion equal to $27\frac{1}{2}$ percent of the amounts actually received by the petitioners in each year, but he now contends that no deductions for depletion should be

allowed the petitioners in connection with these contracts, citing *Helvering* v. *Elbe Oil Land Development Co.*, *supra; Blankenship* v. *United States*, *supra*, and *Helvering* v. *O'Donnell*, 303 U. S. 370.

The distinction drawn by the courts and already referred to under the first issue is determinative of this issue also, the distinction being between contracts made in consideration of cash and a share of the profits from the operation of the properties which result in a sale and contracts whereby an economic interest in the oil is reserved. The contracts covering the Phoenix, Antoine, and Turner leases were clearly contracts of the first kind and resulted in sales of the entire interest which the petitioners had in the leases and any oil covered thereby. Consequently, the petitioners had no depletable interest thereafter and are not entitled to any deductions for deple-tion. *Helvering* v. *Elbe Oil Land Development Co.*, *supra; Blankenship* v. *United States*, *supra*.

The contract covering the Gray leases is different from the contracts covering the other three leases. It purported to convey only three-fourths of McLean's interest and provided: "While this contract covers only an undivided three-fourths ($\frac{3}{4}$) interest in the two assigned tracts, the Gulf Refining Company of Louisiana shall, as and while it holds hereunder, have exclusive operating rights in such two assigned tracts and exclusive control and management of operation." There was a cash consideration of $5,500, and the petitioners were to receive one-fourth of any net profits realized from the operation of the leased premises (excluding royalties due and fuel oil used), after deducting all expenses. Gulf was required to commence drilling operations within a stated time and develop the properties or lose its interest. Thus, McLean retained an economic interest in a part of the oil in place and the payments which he was to receive were secured by that interest and were not dependent alone upon the contractual obligation of Gulf. Although the payments were measured by one-fourth of the net profits realized from the operation of the properties, and although there is no statement in the contract that those payments are to be made from any portion of the oil, nevertheless, this contract did not effect a sale of McLean's interest. It is unlike the contracts in the *Elbe* and *Blankenship* cases, which purported to convey all of the interest of the assignors. It is more like the contracts in the *Palmer*, *Perkins*, and *Harmel* cases. Consequently, we hold that the petitioners are entitled to depletion in connection with the Gray leases.

The Commissioner allowed the petitioners deductions for depletion equal to 27½ percent of the amount which the McLeans actually received in each year from Gulf under the agreements pertaining to the Gray leases. The petitioners contend that they are entitled to a

larger deduction, equal to 27½ percent of one-fourth of the gross proceeds from the sale of production by Gulf. They apparently concede that the royalties payable to the original lessors are to be eliminated as well as any oil used for fuel by Gulf, but they claim that their deduction for depletion should be computed before deducting the expenses of operation. The statutory provision is that the deduction for depletion "shall be 27½ per centum of the gross income from the property during the taxable year." Sec. 114 (b) (3). That section of the Revenue Acts of 1932 and 1934 also provides that there shall be excluded from such gross income "an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property." The term "gross income from the property" means the gross income from the property received by the particular taxpayer claiming a deduction for depletion and is synonymous with the amount to be included in the taxpayer's gross income under section 22. *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312. The gross income from the property, from the standpoint of the McLeans, was the amount which Gulf paid them. They do not even suggest the propriety of including any greater amount in their gross income under section 22. No doubt the amount which Gulf paid them would be considered a rent or royalty paid by that taxpayer in respect of the property in computing its deduction under section 114 (b) (3). The determination of the Commissioner in regard to depletion on the Gray leases is affirmed.

## *Issue No. 3.*

The petitioners acquired an oil and gas lease in 1935 on various parcels of land in Texas. The cost to them of the lease was $1,600. They assigned the lease in that same year to the Humble Oil & Refining Co. for $65,000 in cash and a royalty of one twenty-fourth of the oil produced and saved from the premises. They claimed deductions for depletion on their returns for 1935 based upon the cash payment of $65,000 received in that year. The Commissioner disallowed the deductions in determining the deficiencies for that year. The Humble Oil & Refining Co. forfeited and abandoned the lease in 1938 without ever having produced any oil or gas from the leased premises. The contention of the respondent is that there can be no deduction for depletion, since in fact no oil was removed and no depletion actually took place. He concedes that the payment was an advance royalty taxable as ordinary income and that a deduction for depletion would have been proper had there been any production under the lease.

The case discussed most by the parties, *Berry Oil Co.* v. *United States*, 25 Fed. Supp. 97; certiorari denied, 307 U. S. 634, is not in

point. There was a cash payment and no production. The court interpreted the contract in that case as an absolute sale of one-half of the oil below a certain level and the retention of the remaining one-half interest in that oil. It said there could be no deduction for depletion in regard to the part sold because no economic interest was retained in that and there could be no depletion in regard to the part retained because there was no production. The court deemed the cash payment consideration for the sale and not an advance royalty. Here the parties concede that the payment was an advance royalty and they do not contend that any sale took place.

A deduction for depletion is proper in the year in which an advance royalty is received even though no oil is produced from the property in that year and regardless of the prospects during that year of whether or not oil will be produced in the future. *Herring* v. *Commissioner*, 293 U. S. 322. The case of *Grace M. Barnett*, 39 B. T. A. 864, shows that a deduction for depletion was properly allowed in 1934, the year in which a cash bonus or advance royalty was received, even though the lease was terminated in the following year without any oil or gas having been extracted from the property. The opinion holds that the amount should be restored to income for 1935, the year in which the lease was terminated, because no depletion actually took place. See to the same effect *J. T. Sneed, Jr.*, 40 B. T. A. 1136. We hold, following the authorities above cited, that the petitioners are entitled to percentage depletion for 1935, based upon the advance royalty of $65,000 received in that year.

*Issue No. 4.*

Petitioner Marrs McLean entered into an agreement with his wife on December 29, 1934, which provided as follows:

WHEREAS, the parties hereto are possessed of a community estate and it is their mutual desire to divide a portion of said community estate, share and share alike, to the end that one-half of said entire portion of said community property herein designated shall constitute the sole separate property of each.

Now, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: that for and in consideration of the premises and affection Marrs McLean bears to his wife Verna Hooks McLean, and the mutual agreements herein contained, the said Marrs McLean hereby releases, quitclaims, assigns and sets over unto the said Verna Hooks McLean all of his right, title and interest, including the right of control and disposition in and to all of the following described securities to the end that the same constitutes the sole separate property of the said Verna Hooks McLean:

[Here follows a list of certificates of certain shares of stock.]

For and in consideration of the premises and of the love and affection Verna Hooks McLean bears to the said Marrs McLean, and the mutual agreements herein contained, the said Verna Hooks McLean hereby releases, quitclaims, assigns and sets over unto the said Marrs McLean all of her right,

title and interest in and to all of the following described securities to the end that the same constitutes the sole separate property of the said Marrs McLean:

[Here follows a list of certificates of certain other shares of stock.]

The stocks listed in the foregoing agreement were a part of the petitioners' community estate. The stock certificates stood in the name of Marrs McLean, who, contemporaneously with the execution of the agreement, endorsed them in blank. He and his wife then delivered, each to the other, the stock certificates he or she purported to assign to the other by the agreement.

Marrs McLean and his wife, on the same day, created separate trusts with the First National Bank of Beaumont, Texas, as trustee. Each delivered to the trustee at that time the certificates of stock received by him or her under the agreement. Marrs McLean joined, *pro forma*, in the trust instrument executed by his wife. The provisions of the trust instruments were reciprocal in nature. Each instrument directed the trustee to accumulate and reinvest the income of the trust for a period of ten years, or until the death of the settlor, whichever occurred first, upon the happening of which the trustee was authorized to pay to the settlor's spouse, for life, all, part, or none of the annual net income of the trust, at that spouse's election. The trust corpus, plus any accumulated income, was to be distributed, upon the death of the life beneficiary, to Ruth McLean, the petitioners' daughter, according to a certain plan, and the trust terminated. If Ruth McLean predeceased the life beneficiary without leaving issue, then the entire trust estate was to be delivered to the life beneficiary, but if she predeceased the life beneficiary leaving issue, then such issue were entitled to the remainder interest in the trust upon the death of the life beneficiary. However, if none of such issue survived the life beneficiary, or if Ruth McLean, predeceased by the life beneficiary, left no children or grandchildren surviving her, then the trust estate was to revert to the settlor, if he or she be living, unless Ruth McLean should leave a will disposing of the trust estate, in which event the trust estate was to go as her will directed. Finally, each trust instrument contained provisions, of which the following from the Marrs McLean trust is an example:

The terms and conditions of this trust can be amended by the joint action in writing by Verna Hooks McLean, the trustee and the settlor before Ruth McLean attains the age of twenty-one years, but after Ruth McLean attains the age of twenty-one years, then this trust can be amended only by the joint action in writing by Ruth McLean, the trustee, Verna Hooks McLean, if she is not deceased, and the settlor, if he is not deceased, provided, however, in no event can any amendment be made at any time that will cause any part of the funds in this trust to be paid to or revert to the use and enjoyment of the settlor, as it is the intent of the settlor and the essence of this trust that the settlor has irrevocably divested himself of all interest in this trust estate and he is at no future time to have any interest in the trust estate or its income except the reversionary interest herein provided * * *, and provided further that no amendment prior to her attaining the age of twenty-five (25) years shall

change the effect of this trust, viz., that Ruth McLean is to receive all of the principal sum or corpus of this trust regardless of any change that may be made in the disposition of the income * * *.

Two days later, on December 31, 1934, other shares of stock which constituted part of the petitioners' community estate were delivered to the trustee by Marrs McLean and his wife, to be incorporated in his or her trust after each had first released his or her interest in the shares to the other by an agreement similar to the one executed on December 29.

None of the income received by the trustee from the corpus of each trust has been distributed to either of the petitioners or to anyone else.

The Commissioner, in determining the deficiency for the year 1935, held that the income of the trusts for that year constituted taxable community income of the petitioners for 1935.

The Commissioner made his determination upon the theory that the income of these trusts was taxable to the grantors under section 166 of the Revenue Act of 1934 because there was a possibility that the corpus of the trusts would revert to the grantors. The Board has held, in *William E. Boeing*, 37 B. T. A. 178, reversed on another issue, 106 Fed. (2d) 305, and *Genevieve F. Moore*, 39 B. T. A. 808, that a possibility of reverter does not make the income of a trust taxable to the grantor under section 166 or 167. The following quotation is from the *Boeing* case:

We do not think that the language of this section covers or was intended to cover the situation where there is no definite provision for such future distribution to the grantor, but only the bare possibility that upon certain contingencies over which the grantor has no control the corpus and accumulations may revert to him. This is what has been called a mere "possibility of reverter" in the estate tax cases (*Helvering v. St. Louis Union Trust Co.*, 296 U. S. 39; *Becker v. St. Louis Union Trust Co.*, 296 U. S. 48), and we do not think that where such bare possibility exists the income of the trust may be said to be "held or accumulated for future distribution to the grantor", within the meaning of section 167. That section, being one which cuts across the usual concept of the separate entity of trusts, should not, we think, be given any broader interpretation than its terms require, (cf. *Preston R. Bassett*, 33 B. T. A. 182), and if article 167–1 of Regulations 86 purports to include in the scope of the statute such a trust as the one before us we think the regulation is an erroneous interpretation of the statute.

The two *St. Louis Union Trust Co.* cases cited in the above quotation are no longer to be followed. *Helvering v. Hallock*, 309 U. S. 106. However, those cases had to do with estate tax, and the *Boeing*, the *Moore*, and the present case have to do with income tax. The *St. Louis Union Trust Co.* cases were merely referred to and not relied upon in the *Boeing* case; consequently, there is no reason why the Board should fail to follow the *Boeing* and the *Moore* cases in the present case.

The respondent, anticipating that his original position will not be upheld, has advanced another argument in support of his determination. He says that the attempt by these petitioners to divide a portion of their community property into separate property was invalid under Texas law; their attempts to create trusts thus accomplished nothing; the securities remained community property; and the income from those securities is taxable to the petitioners as community income. The cases which he cites to show that the agreement of December 29, 1934, was invalid fail to adequately support his argument. He has held in companion cases that these transfers were effective and resulted in taxable gifts.

Authorities on the Texas law support the proposition that a husband and wife living in Texas can not change the character of their property generally so as to convert community into separate property. The petitioners concede this. Yet there is authority for the proposition that a husband and wife in Texas may, by gift or agreement between themselves, convert specific property from community property to the separate property of either spouse under some circumstances. Contracts of the latter kind have been enforced where it appeared that they were just, equitable and fair so that they appealed to the conscience of the court. See Speer's Law of Marital Rights in Texas, 3d ed., secs. 56 and 341, and cases there cited. There is no suggestion that the agreement of December 29, 1934, was in any respect unjust, inequitable, or unfair. It affected only a small part of the property of this community. It referred to specific property and purported to make an equal division of that property between the two spouses. Its purpose was to permit each spouse to create a trust. The preamble of each trust recited a desire of the settlor to create a trust fund for the benefit of Ruth McLean. Ruth McLean was the only child of the petitioners.

The respondent has failed to call our attention to any facts which would make invalid, either the agreement of December 29, 1934, or the trusts created on that same day. However, even if the agreement whereby the petitioners attempted to make the property separate property was invalid, still it would not follow that the trusts themselves were invalid. Marrs McLean was a party to each agreement. No authority is cited to show that valid trusts can not be created from Texas community property or that Marrs McLean could not place community property of this community in these trusts. The argument of the respondent does not touch this latter point. We are not convinced that the trusts are invalid, and, having considered and rejected all of the arguments advanced by the respondent on this point, we hold for the petitioners.

*Decisions will be entered under Rule 50.*