Anna Vickers Crawford v. Commissioner.
Crawford v. Commissioner
Docket No. 111047.
United States Tax Court
1944 Tax Ct. Memo LEXIS 318; 3 T.C.M. (CCH) 281; T.C.M. (RIA) 44098; March 24, 1944
*318 Sidney D. Krystal, Esq., 505 Title Ins. Bldg., Los Angeles, Calif., for the petitioner. Harold D. Thomas, Esq., for the respondent. ARNOLD Memorandum Opinion ARNOLD, Judge: This proceeding involves income tax deficiences for 1938, 1939 and 1940, in the respective amounts of $18,018.01, $16,361.57 and $17,339.48. All issues have been settled by agreement of the parties except one common to each of the taxable years, namely, whether petitioner is entitled to percentage depletion on alleged oil royalties of $26,462.50, $23,921.75 and $21,997.34 for the years 1938, 1939 and 1940, respectively. The stipulated facts are adopted as our findings of fact. Only such facts as are necessary for an understanding of the issue will be hereinafter set forth. [The Facts] Petitioner is an individual residing in Los Angeles, California. Her income tax returns for each of the taxable years were filed with the collector of internal revenue for the sixth district of California. At all times herein mentioned petitioner owned an undivided one-third interest in and to certain property situated in the County of Los Angeles, California, known as Rancho La Ballona, a tract of land of 417.330195 acres. *319 On or about April 12, 1924, petitioner, together with Florence Vickers McAllister and Clara Vickers Naftzger, each the owner of an undivided one-third interest as her separate property, as lessors, executed a lease with Standard Oil Company, a California corporation, for the drilling of oil on a portion of the Rancho La Ballona property. The lease covered 150 acres more or less, and recited that the individuals, as first parties, desired to enter into an arrangement with the Standard Oil Company, as second party, whereby Standard "shall develop and operate the said above described real property for oil, gas, asphaltum and other hydrocarbon substances, in accordance with all of the terms and conditions herein set forth * * *." The lease indenture then set forth the mutual covenants and agreements of the parties, which provided, inter alia, for exclusive drilling and operating rights in Standard for the term of two years and so long thereafter as Standard conducted drilling operations thereon and as long as oil, gas, asphaltum or other hydrocarbons were produced in paying quantities. Standard was to pay $75,000 with the execution of the lease and agreed to commence the drilling *320 of a well on the premises within two years and to prosecute the same with reasonable diligence until oil was found in paying quantities. At any time within the two years Standard could terminate the lease and surrender the premises provided, however, that if during the first 21 months of the lease oil was discovered on specified property, situated east and southeast of the lease premises Standard would, within three months after such discovery, commence the drilling of a well, or terminate the lease. Standard agreed to pay $10 per month per acre, or terminate the agreement if it had not commenced the drilling of a well within a year after execution of the lease indenture. If Standard failed to obtain oil in paying quantities in its first well, it was required to commence drilling another well within 90 days in order to retain its rights under the lease indenture. If oil was found in paying quantities additional wells were to be drilled as rapidly as at least two strings of tools working with due diligence could complete the wells. After completion of the first or any subsequent well Standard could cease further drillings, surrender the premises and terminate the agreement as to all *321 the premises, except as to 10 acres around each producing or drilling well which could be held free of further drilling obligations as long as oil or gas was produced therefrom. Standard agreed to commence drilling offset wells within 90 days after discovery of oil within 250 feet of boundary lines of leased premises. All labor and materials were to be furnished by Standard and first parties were not chargeable with nor liable for any part thereof. Standard agreed to pay all damages directly occasioned by operations to growing crops, and in case of dispute as to the amount thereof, arbitration was provided for. The terms "gross proceeds", "sale value", "chargeable expenses" and "net profits" were defined by the lease indenture. Standard was required to keep true and correct books of account and deliver a monthly itemized statement to first parties showing production, "gross proceeds" and "chargeable expenses." Each month Standard was to account and pay to first parties, under paragraph 31 of the lease, as follows: "A. As a minimum: (1) a sum representing the 'sale value' as herein defined of the one-fifth (1/5th) part of all oil, asphaltum and other hydrocarbon substances, other *322 than gas, extracted and saved from the said premises during the preceding calendar month. (2) One-fifth (1/5th) of the actual proceeds of all gas produced and saved and sold off the premises by second party during such preceding calendar month. "B. Such sum, if any, in addition, as shall represent the amount by which one-half (1/2) of the "net profits" derived from the operations on said property up to the end of such calendar month shall exceed the aggregate of - (1) All sums theretofore paid to first parties by second party pursuant to the provisions of this paragraph (31), plus (2) The amount contemporaneously payable by second party to first parties pursuant to the provisions of Subdivision A of this paragraph." Standard was to pay all amounts due first parties under the lease, one-third to each of said first parties. If Standard failed for 90 days after written notice to comply with any provisions of the agreement first parties could, at their option, terminate the agreement, except that default as to any well or wells should not affect Standard's operation of any other well or wells situated in any other 10 acre parcel. On or about January 6, 1925, the same parties executed *323 a lease for the drilling of oil on another portion of the Rancho La Ballona property. This lease covered 80 acres, more or less, was for a term of five years and so long thereafter as oil, gas, etc., were produced in paying quantities unless otherwise surrendered or forfeited by Standard. The provisions of the lease are substantially the same as the provisions of the first lease between the parties. The consideration was different in that $80,000 was paid by Standard with the execution of the lease and the minimum monthly sum to be paid first parties under paragraph 31 A of the January 6, 1925, lease was one-sixth (1/6th) of all oil, etc., and one-sixth (1/6th) of the actual proceeds of all gas produced, saved and sold. Paragraph 31 B of this lease is identical with paragraph 31 B of the lease of April 12, 1924, between the same parties. On or about April 18, 1924, Anna Vickers Crawford, Florence Vickers McAllister and Clara Vickers Naftzger, as lessors, executed a lease with Associated Oil Company, a California corporation, for the drilling of oil on another portion of the Rancho La Ballona property. This lease covered 101 acres, more or less, and was for a term of 20 years. It *324 provided for the payment to the lessors of a cash bonus of $50,500; an oil bonus of $50,500 payable only out of net production, paragraph 4 of the lease; "a primary royalty of one-sixth (1/6th) of the net amount of all petroleum, oil, naphtha and other hydrocarbon substances which may be produced and saved from the demised premises, after deducting from the gross product the quantity that may be consumed in the development and operation of said property * * *", paragraph 22 of the lease; and one-sixth of the "proceeds from the sale of all gas produced and sold on the demised premises", paragraph 22 of the lease. The lessee was authorized to contract for the manufacture of casing-head gasoline, provided, at least 35 percent of said gasoline was reserved to be divided between the lessors and lessee on the ba is of one-sixth and five-sixths, respectively, paragraph 22 of the lease. By paragraph 23 of the lease indenture the lessors reserved and the lessee agreed to render and pay unto the lessors "an additional or secondary royalty which shall become payable and shall be ascertainable as follows * * *." After providing in detail for all charges which should be known as "Operating Charges" *325 and for all items that should be known as "Income Credits", paragraph 23 then provided as follows: "When, and as soon as the 'Income Credits' of said account shall exceed the 'Operating Charges' of the Lessee, the Lessor shall be entitled to a secondary and additional royalty, the amount thereof to be one-half of such difference between the 'Operating Charges' and 'Income Credits' of said account." The lessee was to account to the lessors for production and operations monthly and payment made on the 20th day of each month "for all royalties due the Lessors during the preceding calendar month." The lessee had the right to surrender the lease at any time and by the surrender and the execution of a quitclaim deed be released from all further drilling obligations as to such surrendered land. Upon the termination of the lessee's rights "the title to all unsevered petroleum, oil, natural gas and other hydrocarbon substances lying in and under the demised premises shall revert to the respective owners thereof * * *." If the lessee failed for a period of 90 days after written notice given by the lessors to comply with any provisions of the lease, the lessors could, at their option, terminate *326 the lease, with exceptions not here material. During 1938, 1939, and 1940, petitioner received from Standard Oil Company, pursuant to paragraph 31A of the Standard leases dated April 12, 1924, and January 6, 1925, gross income from primary royalties in aggregate amounts as follows: Year
Amount
1938
$50,321.41
1939
45,771.09
1940
39,534.63
During the taxable years petitioner received from Standard Oil Company, pursuant to paragraph 31B of the aforesaid lease, aggregate sums of money, as follows: Year
Amount
1938
$62,327.91
1939
52,693.39
1940
44,506.39
During the taxable years petitioner received in cash royalties from Associated Oil Company, pursuant to paragraph 22 of the lease dated April 18, 1924, aggregate sums of money as follows: Year
Amount
1938
$19,700.03
1939
20,275.00
1940
20,958.88
During the taxable years petitioner received from Associated Oil Company, pursuant to paragraph 23 of the lease dated April 18, 1924, aggregate sums of money as follows: Year
Amount
1938
$34,729.20
1939
34,883.54
1940
39,941.02
In determining the deficiencies respondent included in gross income for the respective years the amounts received *327 from Standard and Associated Oil Companies, but allowed deductions for percentage depletion only with respect to receipts under paragraph 31A of the Standard leases and paragraph 22 of the Associated lease. Respondent contends that petitioner, as the owner and lessor of oil lands, is not entitled to percentage depletion upon amounts received from her lessees which represent a percentage of the net profits of the lessees from their operations on the lease premises. The controversy relates solely to the lessor's right to deplete these additional payments to be made under the prescribed circumstances and conditions set forth in these leases, and no controversy exists between the parties as to the lessor's right to deplete the one-fifth and one-sixth parts of production provided for in paragraph 31A of the Standard leases and the one-sixth primary royalty as provided for in paragraph 22 of the Associated lease. For convenience, therefore, we shall refer to the one-fifth and one-sixth interests retained by the lessor as a royalty interest, or royalty, and to the additional payments to be made by the lessees under said stated conditions and circumstances as "net profits." Respondent submits *328 that the petitioner's right to share in the net profits of her lessees is not such an economic interest in oil in place as will entitle her to a percentage depletion deduction thereon. We believe that respondent's argument ignores the critical factor in this case. Petitioner retained an economic interest in the oil by virtue of the royalty interest retained in each of the leases. Having such an interest, the question is what was her "gross income from the property" under section 114 (b)(3) for the purpose of the depletion deduction allowed by section 23 (m) of the Internal Revenue Code. This question was considered and decided in our decision in Kirby Petroleum Co., 2 T.C. 1258, which followed W. S. Green, 26 B.T.A. 1017, and Marrs McLean, 41 B.T.A. 565, and distinguished Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 82 L. Ed. 904, 58 S. Ct. 621. Upon the authority of the Kirby Petroleum Co. case and the cases therein cited, decision here must be for the petitioner on the contested issue. In addition we wish to point out that the leases granted the exclusive right to *329 develop and operate the premises for oil, gas and other minerals. The other property rights were retained by lessors. The interest retained by the petitioner-lessor was unquestionably an economic interest, and under the terms of the leases, the lessees were entitled only to that portion of the oil, gas and other mineral produced, extracted and saved, and upon forfeiture or surrender of the leases, or any part thereof, the economic interest would still be in the petitioner-lessor to the extent of her one-third ownership thereof. Since other adjustments were involved in determining the deficiencies herein, and since respondent erred in the making of certain of said adjustments, as stipulated by the parties. Decision will be entered under Rule 50.