Ronald K. Evans v. Commissioner.
Ronald K. Evans v. Commissioner
Docket No. 5510.
United States Tax Court
1946 Tax Ct. Memo LEXIS 276; 5 T.C.M. (CCH) 84; T.C.M. (RIA) 46043; January 31, 1946
Edward S. Reid, Jr., Esq., and E. Reed Hunt, Esq., 2264 Penobscot Bldg., Detroit, Mich., for the petitioner. A. J. Friedman, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in petitioner's income tax liability for the years 1939, 1940, and 1941, in the following respective amounts, $1,511.21, $2,306.82, *277 and $3,694.07. Petitioner has accepted as correct certain adjustments for each of the taxable years which respondent made, but he contests determination that the income of four trusts should be included in his income. Petitioner created four trusts in 1936 for the benefit of his wife and three children. The income from the trusts aggregated $4,553.04 in 1939, $5,183.73 in 1940 and $5,353.72 in 1941. The question presented is whether petitioner is taxable on the income of the trusts under section 22(a), or sections 166 or 167 of the Internal Revenue Code. Petitioner filed his income tax returns for the taxable years with the collector for the district of Michigan at Detroit. The record consists of oral testimony adduced at the hearing and exhibits. A brief stipulation of facts was filed which is incorporated in the findings of fact. Findings of Fact Petitioner resides in Birmingham, Oakland County, Michigan. Petitioner and his wife, Gladys, have three children; Catharine, born October 1, 1920; Robert, born August 5, 1923; and Noele, born December 25, 1924. During the years in question Catharine attained her majority on October 1, 1941; Robert and Noele *278 were minors. Petitioner paid for the support of his minor children during the taxable years out of his own income, and no part of the funds of the trusts was used for their support. After Catharine attained her majority in 1941, petitioner continued to provide her support, and no part of the trust funds was used for that purpose. During the years here involved, petitioner was a vice president of General Motors Corporation in charge of the diesel motors production division. His gross income in 1939, 1940, and 1941 was $99,898.56, $127,922.31, and $94,798.06, respectively. Petitioner provided the support of his wife, Gladys, from his own funds during the years in question, and no part of the trust funds was used for that purpose. On November 18, 1936, petitioner entered into a trust agreement with National Bank of Detroit, trustee, which is incorporated herein by reference. Under the agreement, the settlor created four separate trusts, one for the benefit of his wife, Gladys, and one for each of his three children, named above. The settlor designated, in the agreement, the four trusts as Trust Fund Number 1, to Trust Fund Number 4, inclusive, and on the schedule of property conveyed *279 to the trustee, he designated in four separate schedules the shares of stock which were to be held for each trust. Petitioner conveyed to the trustee irrevocably in trust the following shares of stock on November 18, 1936: For Trust No. 1: (Gladys Evans)
41 shares of General Motors preferred stock.
760 shares of General Motors common stock.
For Trust No. 2: (Catharine Evans)
300 shares of General Motors common stock.
For Trust No. 3: (Robert Evans)
70 shares of General Motors common stock.
For Trust No. 4: (Noele Evans)
70 shares of General Motors common stock.
The total number of shares of stock of General Motors Corporation transferred to the trustee in 1936 was 41 shares of preferred and 1,200 shares of common. The trustee set up on its books four separate trusts and four separate trust accounts numbered as follows: trust for Gladys Evans, Account No. 1427; trust for Catharine Evans, account No. 1428; trust for Robert Evans, account No. 1429; trust for Noele Evans, account No. 1430. The trustee kept the accounts for the trusts separately. Petitioner made gifts of more General Motors stock to each of the trusts on January 20, 1937, and December 30, 1938, the *280 aggregate number of shares being as follows: To the trust for Gladys, 195 shares; to the trust for Catharine, 286 shares; to the trust for Robert, 195 shares; and to the trust for Noele, 190 shares. The trust agreement permitted him to make additional transfers of securities and other personal property to the trusts. The trusts created under the agreement of November 18, 1936 are irrevocable. Each trust is to exist during the lifetime of the beneficiary, and the beneficiary is to receive the income for life, excepting that the income is to be accumulated by the trustee and added to principal during the minority of the beneficiaries who are the children of petitioner. It is provided that no payments shall be made out of the principal or income of the trusts to the settlor, Ronald K. Evans. Provision is made for the continuance of each trust after the death of the life beneficiary, for the benefit of the surviving issue, or, if none, for the benefit of the surviving beneficiaries of the other trusts. Upon the expiration of 21 years after the death of the survivor of Gladys Evans and the three children, all trusts which have not vested in possession prior to such time shall terminate *281 and the principal and accumulated income shall be paid to the then living beneficiaries. The trustee shall render full and separate accounts to each beneficiary quarterly, and shall receive compensation for his services. The trustee may, in its discretion, advance portions of the principal of a trust to a beneficiary if the currently distributable funds of the trust are not sufficient to provide for the maintenance, comfort, and education of the beneficiary. The trustee shall hold and manage each trust fund, and collect the income, and shall have power to invest and re-invest the funds without the restrictions imposed upon trustees under the laws of Michigan. The trustee is given broad powers, including, by way of illustration, the power to purchase for the trusts, and to sell, assign, transfer, mortgage, pledge, hypothecate, and exchange property for the trust; and to do all things incidental to the management and control of the trusts. However, the power of the trustee to mortgage, pledge or hypothecate the assets of the trusts shall not be exercisable after the death of the settlor of the trusts, and (12) Before making any changes in the investments in any of the trust funds *282 created hereby, the Trustee shall submit all proposed changes to the Settlor for his approval or disapproval during his lifetime, and the Trustee shall be governed by such approval or disapproval. The Settlor further reserves the right during his lifetime to instruct the Trustee to invest moneys belonging to the trust funds hereof in such investments as he may in his own uncontrolled discretion select and to sell or exchange any and all investments held in the trust funds hereof from time to time, and the Trustee shall promptly carry out such instructions given to it in writing by the Settlor. The settlor of the trusts, petitioner, reserved the right during his lifetime to change the trustee, as follows: (10) * * * At any time during his lifetime the Settlor may, upon ninety days' notice in writing, change the Trustee under this Agreement, and, upon such notice duly given, the Trustee hereby agrees to transfer and surrender all of the securities and property of every kind held by it under this agreement to the new Trustee named by the Settlor. Any new Trustee thus named by the Settlor under the provisions of this section shall be a corporation duly authorized by law to act *283 in the capacity as Trustee for such a trust and shall be a corporation having a capital stock of not less than $1,000,000.00. In the event a successor trustee is appointed, the Settlor may change the rights and duties of the successor to such extent as he may deem proper, provided only that no such change may be made as will, directly or indirectly, divest the successor trustee of any of the incidents of legal ownership of the Trust Funds hereof nor change the distribution of income or principal of said trust funds. The trustee is given the right, also, to use property in a trust to purchase assets from the estate of the settlor, and to make loans, upon ample security, as follows: (2) * * * The Trustee may use all or any portion of the trust estate that it may deem for the best interests of the beneficiaries of the trusts hereof, to purchase assets from the personal representatives of the estate of the Settlor or the Trustees thereof, and may make loans, only upon ample security, to the personal representatives of the estate of the Settlor or the Trustees of his estate, the Settlor, or to any beneficiary of the trusts hereof. The Trustee shall not be liable for any losses that *284 may be sustained on account of loans or assets purchased in the exercise of this power. The trust agreement provides for the contingency of a beneficiary's dying without leaving surviving issue for whose benefit the particular trust would be continued. Briefly, when Gladys Evans dies, the property in her trust, number 1, is to be added to the principal of the trust for Catharine, trust number 2. If Catharine predeceases her mother, Gladys, without leaving issue to succeed to her interest, then the property in her trust is to be added to the principal of trust number 1. If all of the beneficiaries of trust numbers 3 and 4, present and contingent, die, and another trust is in existence, either trust number 1, or 2, the principal of trust 3 or 4 is to be added to trust 1 or 2, or a combination thereof. If trust number 1 or 2, or a combination thereof, is not in existence, the principal of trust number 3 is to be added to trust number 4, or vice versa. The trust agreement deals with the various possibilities as follows: (8) Upon the death of all of the beneficiaries, present and contingent, of Trust Funds #3 or #4 prior to the termination thereof, the principal and accumulated income, *285 if any, of the trust fund held for such deceased beneficiaries shall be added, share and share alike, to the principal of Trust Funds #1 and #2 or to the combination of #1 and #2, provided that if said trust funds have already terminated then the principal and accumulated income of the trust fund held for such deceased beneficiaries shall in the case of Trust #3 be added to the principal of Trust #4 and in case of Trust #4 be added to the principal of Trust #3 and upon the death of all beneficiaries present or contingent of the remaining trust of trust funds #3 and #4 then the Trustee shall pay over the principal and accumulated income then in its hands to those who under the laws of the State of Michigan in cases of intestacy would be the heirs-at-law of the Settlor had he died at that time, unless the Settlor shall be living at that time, in which event, the principal and accumulated income then in the hands of the Trustee shall be paid over to him free and discharged from all of the trusts hereof. * * * * *
(4) * * * After the death of Gladys MacArthur Evans, wife of the Settlor, the principal of Trust Fund #1 shall be added by the Trustee to the principal of Trust Fund #2 *286 and administered thereafter in accord with the provisions hereinafter made for such Trust Fund #2, unless the prior decease of Catharine Anne Evans, daughter of the Settlor, without living issue shall have caused said Trust Fund #2 to have been added to Trust Fund #1 prior to the death of Gladys MacArthur Evans, wife of the Settlor. In this case, upon the death of the survivor of Gladys MacArthur Evans, so much of the principal of the combined Trust Funds #1 and #2 shall be added, share and share alike, to Trust Funds #3 and #4 as may be necessary to give Trust Fund #3 and Trust Fund #4 a then value of $100,000 each. All of the combined Trust Funds #1 and #2 not required for this purpose shall be paid to the Settlor, if then living, and if he be not then living, then to those who under the laws of the State of Michigan in cases of intestacy would be the heirs-at-law of the Settlor had he died at that time. During the period of the administration of the trusts from the time of their creation through the taxable years, the trustee has invested funds in stocks of various corporations, including General Motors, National Bank of Detroit, American Telephone & Telegraph, S. S. Kresge Co. *287 , Sears-Roebuck Co., J. C. Penney Co., and United States Savings bonds were purchased for each trust. In February, 1937, 106 shares of General Motors common stock were sold from trust number 1, and 104 shares of General Motors common stock were sold from trust number 3. On March 23, 1938, there were sales of General Motors common stock from the four trusts; from trust number 1, 357 shares; from trust number 2, 228 shares; from trust number 3, 24 shares; and from trust number 4, 85 shares. Of the sums which have been invested for each trust, the largest sums have been expended for the purchase of General Motors stock. There were transactions by the trustee of sales, or purchases, or both for the trusts in 1937, 1938, and 1939, but there were no transactions in 1940 and 1941, except some sales of stock rights of American Telephone & Telegraph stock in 1941 from trusts numbers 2 and 4. During the years 1939, 1940, and 1941, no distributions of income were made to the respective beneficiaries of trusts numbers 2, 3, and 4, and the only disbursements made were to the trustee for his fees for services. The net income of these trusts was transferred to the principal accounts for investment, *288 and was invested. During the same years part of the current income of trust number 1 was distributed to the beneficiary, Gladys Evans, as follows: $1,659.13, $2,258.25, and $2,367.83, and payments of fees were made to the trustee. On January 1, 1939, the trusts held General Motors common stock as follows: Trust number 1, 495 shares; trust number 2, 395 shares; trust number 3, 145 shares; trust number 4, 190 shares. In 1936 two officers of the National Bank of Detroit called on petitioner at his office to suggest to him that he give consideration to establishing trusts for his wife and children. They suggested that he should employ his own attorney to draft the trust agreements. The trustee held all certificates of stock of the four trusts in the name of its own nominee. They were never carried in the name of the settlor of the trusts. During the existence of the trusts, the trustee has never made any loans out of trust funds or property to petitioner, and he has never requested any loans. After the trusts were created, the trust department of National Bank of Detroit advised petitioner by letter, from time to time and with some regularity, of the status of the accounts of *289 the trusts, called his attention to the existence of any substantial cash balances, and stated that officers of the department would be glad to discuss with petitioner the investment of such cash balances. The bank has a trust investment committee which reviews the investments held in trust accounts. This committee reviewed the Evans trusts accounts from time to time, and made recommendations for the investment of funds, for diversification of holdings, and for re-investment of funds. These recommendations were forwarded to petitioner in letters from officers of the trust department. The investment Committee of the bank recognized that petitioner had full responsibility for investments for the trusts, but the committee recommended to him that certain investments should or should not be made, and petitioner, on occasions, asked for their opinion on certain possible investments. Petitioner did not adopt some of the suggestions made to him in this way at all, in some instances, in other instances he accepted suggestions, and acted accordingly, either at the time the suggestion was made, or later; in some instances waiting a year before he acted upon a suggestion. The trust department *290 recommended to petitioner that stocks of Kresge, Sears-Roebuck Co., J. C. Penney corporations should be purchased for the trusts, and war savings bonds, and petitioner directed that purchases should be made. The Committee believed, in January, 1937, that the trusts held too much of one stock, General Motors, and suggested that some of the holdings of that stock should be sold, and the proceeds re-invested in other stocks, to accomplish diversification of holdings. Petitioner did not accept the suggestion favorably, and replied that the matter be postponed for a few months. He felt that the trusts should hold the General Motors stock. In February, 1937, some of the General Motors common stock held in trusts numbers 1 and 3 was sold. In December, 1937, the investment committee recommended retention of all of the holdings in the trusts until the next meeting of the committee. Subsequently, a few shares of General Motors stock were purchased for each trust by the trustee in compliance with instructions from petitioner. In March, 1938, petitioner directed the trust to sell approximately one-half of the General Motors common stock held in the four trusts. The parties have stipulated *291 that on one occasion the trustee recommended that savings bonds should be purchased for one trust, but petitioner did not accept the suggestion and instructed the trustee to purchase bank stock, which the trustee did. All purchases and sales of securities for the trusts were approved in writing by petitioner. He made the final decisions on all purchases and sales, and in many instances he initiated the idea and instructed the trustee to make a purchase or sale. On the whole, there were not a great many purchase and sale transactions for the trusts from 1937 through 1941. In 1939, 1940, and 1941 the total income of each trust was about $4,835, $5,792, and $5,972. The proceeds of the sales of General Motors stock from all of the trusts in December, 1938 were about $21,343. Petitioner did not retain the right to vote the stock held in the trusts, and he did not direct or request the trustee to vote the General Motors stock. Petitioner retained the right to instruct the trustee of the trusts on the investment of trust funds, and he reserved the right to approve and disapprove all proposed changes in the holdings of the trusts during his lifetime, because he anticipated that the trustee *292 might consider selling the General Motors stock, and he believed General Motors stock was the best stock he knew of to be held in trust for the beneficiaries of the trusts, out of his personal knowledge of the business of the Company, and he wanted General Motors stock to be in those trusts. Petitioner did not derive any economic benefit from the exercise of his retained power to approve and disapprove changes by the trustee in the holdings of the trusts, and of his retained power to instruct the trustees to make purchases and sales for the stock. Opinion The first question is whether petitioner retained such control over the property in the trusts which he created in 1936, under the terms of the trust agreement, that he remained in effect the owner of the trust property so as to be taxable on the income of all of the trusts under section 22(a) of the Internal Revenue Code under the doctrine of Helvering v. Clifford, 309 U.S. 331. Respondent contends that the powers retained by petitioner under paragraph 12 of the trust agreement, relating to control over investments, were of such magnitude as to require the application of the doctrine of the *293 Clifford case to the trusts in question. Upon consideration of the trust agreement in its entirety and of all of the evidence, it is held that petitioner did not retain the degree of control over the property of the trusts which would make him the virtual owner of the property despite his conveyances to the trusts. There are absent most of the elements of control over the principal and income of the trusts in the settlor, which have been held to defeat a taxpayer's contention of effective separation of himself, as settlor, from a trust, and to require taxing the settlor on trust income, under the doctrine of the Clifford case, and the holdings in a long line of cases following that case. The absence of the elements is so clear and so apparent that it would be a redundant expression and a re-duplication of oft-stated principles to elaborate upon the point, and to point out why, in general, the rule of the Clifford case does not apply to the Evans trusts. More particularly, the reservation of the power in the petitioner in the trust agreement to direct the investment policy of the corporate trustee, did not give to petitioner any of the economic benefits which are the concomitant *294 of ownership of property, either alone or in conjunction with any of the other comparatively minor powers the petitioner had under the trust agreements. We are of the opinion that such powers as petitioner desired to retain over the management of trust investments during his lifetime, he retained, clearly, for the benefit of the beneficiaries of the trusts, and not for himself, and that petitioner was bound to use good faith in his exercise of that power. By experience and because of his position as an executive of General Motors Corporation, petitioner was in a position to exercise sound judgment in the matter of holding, selling, or buying for the trusts the stock of that corporation, for the benefit of the beneficiaries. His confidence in that corporation is one which many share, and it was an honest belief to which no self-interest, in contrast to interest in the beneficiaries of the trusts, can be imputed upon the record in this case. It is held that respondent erred in including the income of all of the trusts in petitioner's income in the taxable years under section 22(a), upon the authority of the following cases: Carrier v. Carrier, 226 N. Y. 114, 123 N.E. 135; *295 Commissioner v. Betts, 123 Fed. (2d) 534; Commissioner v. Branch, 114 Fed. (2d) 985; Jones v. Norris, 122 Fed. (2d) 6; Estate of Benjamin Lowenstein, 3 T.C. 1133; Hall v. Commissioner, 150 Fed. (2d) 304; John Stuart, 2 T.C. 1103; Herbert T. Cherry, 3 T.C. 1171. Respondent's alternative argument that the income of the trusts is taxable to petitioner under sections 166 and 167 must be rejected. Clearly the trusts cannot be said to be revocable, so that section 166 does not apply. Respondent appears not to contend, seriously, that it does. With respect to section 167, respondent invokes the rule of Helvering v. Hallock, 309 U.S. 106; Fidelity-Philadelphia Trust Co. v. Rothensies, 324 U.S. 108; and Commissioner v. Estate of Field, 324 U.S. 113. In our opinion, the possibility of a reversion to petitioner of the principal and accumulated income of any trust was remote. It has been held in many cases that a mere possibility of reverter is not sufficient to cause the income of an irrevocable trust to be taxed to the settlor under section 167 and we still follow *296 the rule. See William E. Boeing, 37 B.T.A. 178, reversed on another issue, 106 Fed. (2d) 305; Commissioner v. Betts, supra; Henry Martyn Baker, 43 B.T.A. 1029; Marrs McLean, 41 B.T.A. 565; aff'd on another point, 120 Fed. (2d) 942; Frederick Ayer, 45 B.T.A. 146, 152. This argument of respondent is rejected. Respondent has admitted in his answer the allegations of fact set forth in paragraph 5(m) of the petition. Petitioner has filed claims for refunds of excess taxes paid for the years 1939 and 1940 which have been allowed in the amounts of $1,175.09 and $1,228.31, based upon deductions for losses in the amount of $1,991.67 and $1,801.30. The claims have not been paid, respondent having made off-sets against deficiencies which he determined for the taxable years. The Tax Court does not have jurisdiction over refunds, but reference is made to the matter at this time because it is included in the pleadings in this case. Although the question presented is decided in petitioner's favor, recomputation is necessary under Rule 50. Decision will be entered under Rule 50.